[No. C058539. Third Dist. June 30, 2009.]

JENNIFER SCOTT, Plaintiff and Respondent, v.
PHOENIX SCHOOLS, INC., Defendant and Appellant.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*The Reporter of Decisions is directed to publish the opinion except for parts III and IV of the Discussion.

## COUNSEL

Kronick, Moskovitz, Tiedemann & Girard, Bruce A. Scheidt, Kristianne T. Seargeant and Meredith Packer for Defendant and Appellant.

Mary-Alice Coleman and James C. Ashworth for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—This is a wrongful termination action. Plaintiff Jennifer Scott was employed by defendant Phoenix Schools, Inc. (Phoenix), as the director of its Rocklin, California, preschool. She had the responsibility of assigning personnel to comply with the state regulations that set the minimum teacher-student ratios for childcare centers. (Cal. Code Regs., tit. 22, §§ 101216.3, 101416.5 & 101516.5.)

Phoenix terminated Scott in August 2006, shortly after she informed the parents of a prospective student that the school had no room for their child. Scott sued Phoenix, alleging her termination violated the public policy embodied in the state regulations. She alleged she was terminated for refusing to violate the staffing ratio regulations, the implication being that the admission of the extra child would have resulted in a regulatory violation. After a jury trial, judgment was entered in favor of Scott, awarding her $1,108,247 in compensatory and $750,000 in punitive damages.

Phoenix argues there was insufficient evidence to sustain the jury's finding that it violated public policy when it terminated Scott, that the trial court erred in refusing to set aside the punitive damages award, that prejudicial evidentiary rulings compromised the fairness of the trial, and that the compensatory damage award was excessive and unsupported by the evidence.

In the published part of the opinion[1] we shall conclude there was substantial evidence that Phoenix violated public policy in dismissing Scott but there was insufficient evidence of malice or oppression to sustain the award of punitive damages and shall reverse the punitive damage award on that ground. We shall affirm the remainder of the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 31, 2006, Juanita McMaster arrived at Phoenix's Rocklin preschool campus to visit the school in anticipation of sending her child to

---

[1] The Reporter of Decisions is directed to publish the opinion except for parts III and IV of the Discussion.

preschool. McMaster did not have an appointment, and Scott was outside at the time supervising children. Scott gave McMaster an abbreviated tour because she needed to be outside to comply with the required teacher-student ratio. Scott estimated she spent 10 to 15 minutes with Juanita McMaster. Scott told McMaster there was currently no space for her child, but that there would be space available in a couple of weeks, and put her daughter's name on a waiting list.

Juanita McMaster came back to the Rocklin school with her husband a couple of days later. This time, they were shown around by Suzie Aguirre, who was part of the school's administrative staff. In contrast to the information Scott had given Mrs. McMaster two days earlier, Aguirre told the McMasters there was an immediate opening for their daughter.

Mr. McMaster sent an e-mail to Kelly Lister, who was the regional director for Phoenix. The message expressed the following complaint:

"When my wife arrived for her appointment she got a very cursory tour of the facility and felt that Jennifer was only doing it because she felt she had to, not out of any genuine interest. Jennifer was asked if they taught any Spanish to the child as other schools have this as a part of their curriculum. She was told no they do not teach Spanish. My wife's response was 'Oh that's too bad because my daughter speaks Spanish at home with us.' Jennifer's response was 'Well, all of the instruction is in English, so you should really think about whether she should be in this School.' This was delivered in [a] manner my wife understood as seriously trying to discourage her from enrolling our daughter . . . . My wife asked if they had any spots available and was told 'No, but you can get on the waiting list.' She did this . . . . During her entire time with Jennifer she felt that Jennifer could not wait for her to leave and was only doing what she did out of some sense of obligation to her job. Just going through the motions, if you will.

"This morning (08/02/2006) my wife and I met at the pre-school and received another tour and introduction . . . . It was not with Jennifer. When we arrived she remembered my wife and pulled out the 'Tickler File' to find her information. After looking through the file 3 times she could not find my wife's information and took us into the facility for a tour. It was a very good introduction to the facility, in fact, I liked it very much. During the tour it was mentioned that Spanish was taught at the school and our daughter would move from the 'ladybugs' into the 3 year old class most likely in February. I found [Aguirre] to be very informative, interested in the children and excited about the place she worked. As the tour was concluding, I asked if they had any availability and she said, 'Yes, we have 3 or 4 spots right now and it is probably best if you get her in before September, as it tends to fill up quickly

around that time.' . . . As we left, my wife recounted with me once again what had happened on her tour with Jennifer.

"I went back in to the facility and confronted Jennifer and [Aguirre] about how my wife felt she was treated. She responded 'Oh, I can't imagine why.' I asked her about availability and her response was to tell me that she put her on the waiting list and proceeded to show me the list . . . . I said '[Aguirre] just told me there were 3 or 4 spots available immediately.' She gave a blank look to [Aguirre] (who confirmed availability) and then she began the backpedaling about having two teachers transfer, the school year starting on 8/26/06 and how she didn't like to start new families before the new school year ended. None of this made any sense to me in regard to how this would limit my daughter enrolling immediately . . . .

"Needless to say, we will not be enrolling our daughter in the Rocklin pre-school.

"I await your response and sincerely hope that you can use this as a growth opportunity for your company. I have not decided if I feel further action is necessary on my part, it may be warranted as this type of behavior can not be allowed to continue."

Lister forwarded the e-mail to Char Brohl, the senior vice-president of Phoenix's parent company, Mini-Skools. Brohl made the decision to suspend Scott the next day. Scott was suspended for a day and a half, after which she took a preplanned week of vacation. During that week, the decision was made to terminate Scott because of poor job performance due to her failure to enroll the McMaster child.

The McMaster child was two years old. Out of nine total classrooms, the school had two classrooms for two- to three-year-old children who were not yet potty trained. The McMaster child would have gone into the Ladybugs classroom, which had only an aide permanently assigned to the room, and no qualified teacher permanently assigned. The Ladybugs classroom was short-staffed, because two teachers left during the summer.

Phoenix employed full-time, part-time, and temporary teachers and aides. The staff arrived at different times during the day, and the number of children attending changed from day to day. No teacher worked the entire eleven and one-half hours the school was open. If a teacher stepped out of the room, it was necessary to get another teacher in to replace her. The three administrative staffers at the school, including Scott, were also qualified teachers. They filled in as needed, but they also had their administrative duties to perform. Teachers from another room could be brought in as an emergency measure, but not as a permanent fix because they had their own classroom responsibilities.

Scott was an at-will employee. At the time of her termination she was 37 years old, had worked for Phoenix for 13 years, and was earning approximately $42,000 per year.

## DISCUSSION

## I

### Discharge in Violation of Public Policy

Following the jury verdict in favor of Scott, Phoenix brought a motion for judgment notwithstanding the verdict and for a new trial, which were both denied by the trial court. Phoenix argues the trial court erred in denying the motion for judgment notwithstanding the verdict because there was no substantial evidence Scott was terminated in violation of public policy.

We review the order denying the motion for judgment notwithstanding the verdict for substantial evidence. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [104 Cal.Rptr.2d 602, 18 P.3d 29].)

■ An employment contract for an indefinite duration is normally terminable at the will of either party. (Lab. Code, § 2922; *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 172 [164 Cal.Rptr. 839, 610 P.2d 1330] (*Tameny*).) However, an employer may be liable in tort for discharging an employee for performing an act that public policy encourages, or refusing to perform an act that public policy would condemn. (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090 [4 Cal.Rptr.2d 874, 824 P.2d 680] (*Gantt*), overruled on other grounds in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80 [78 Cal.Rptr.2d 16, 960 P.2d 1046]; *Tameny, supra,* at pp. 174–177.) A wrongful discharge in violation of public policy is commonly referred to as a "*Tameny*" claim. Determining whether a claim involves a matter of public policy as opposed to an ordinary dispute between the employer and employee depends on whether the matter affects society at large, whether the policy is sufficiently clear, and whether it is fundamental, substantial, and well established at the time of the termination. (*Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 661 [107 Cal.Rptr.2d 682].)

Violations of public policy generally fall into four categories: (1) termination for refusing to violate a statute, (2) termination for performing a statutory obligation, (3) termination for exercising a statutory right or privilege, or (4) termination for reporting an alleged violation of a statute of public importance. (*Gantt, supra,* 1 Cal.4th at pp. 1090–1091.) Refusal to violate a governmental regulation may also be the basis for a tort cause of action

where the administrative regulation enunciates a fundamental public policy and is authorized by statute. (*Green v. Ralee Engineering Co., supra*, 19 Cal.4th at pp. 79–80.)

In this case, Scott asserted she was terminated for refusing to violate California Code of Regulations, title 22, section 101216.3. Subdivisions (a) and (b) of that section provide that there must be one teacher for every 12 children, but if the teacher is fully qualified, one teacher and one aide may supervise no more than 18 children. Phoenix argues the verdict must be overturned because (1) no substantial evidence exists that enrolling the McMaster child would have violated the regulation, (2) no substantial evidence exists that Scott notified Phoenix that enrolling the McMaster child would have violated the regulation, and (3) the regulation does not reflect a fundamental or important public policy.

### A. Substantial Evidence of Violation of Regulation

In *DeSoto v. Yellow Freight Systems, Inc.* (9th Cir. 1992) 957 F.2d 655, 658–659, the Ninth Circuit held that no public policy violation occurs where the employee's belief that the employer's directive would result in a violation of law is mistaken. Thus, Phoenix argues there was insufficient evidence that the enrollment of the McMaster child would have actually resulted in a violation of the regulation governing teacher-student ratios. Assuming, without deciding, that there is no public policy violation if the employee merely believes that what she is being asked to do violates the law, we nevertheless shall conclude there was sufficient evidence of violation of the regulation.

Phoenix argues the evidence showed that Scott's unwillingness to enroll the McMaster child arose from a personal preference to wait until a permanent teacher was assigned to the classroom for McMaster's age group, and not because the enrollment of the child would have violated the regulation. In support of this argument, Phoenix points to Scott's testimony that she explained to Lister, in reference to the McMaster e-mail, that she did not have the steady staff in the two-year-old classroom, and that she would prefer not to enroll children when part of the enrollment process is introducing the teacher. Phoenix argues that Scott continued to staff the Ladybugs classroom after the two teachers left by rotating unassigned teachers and an aide into the classroom, and there was no evidence that enrolling the McMaster child in and of itself would have violated the law.

In reviewing whether there was substantial evidence to show the enrollment of the McMaster child would have violated the teacher-student ratios, we resolve all conflicts and indulge all legitimate and reasonable inferences in favor of the verdict. (*Western States Petroleum Assn. v. Superior Court*

(1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) If there is substantial evidence from which more than one reasonable inference may be drawn, we are without power to substitute our deductions for those of the trier of fact. (*Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1481 [255 Cal.Rptr. 755].) In such case the verdict must be upheld even though the evidence is subject to more than one reasonable interpretation.

The Ladybugs class roster as of the date Mrs. McMaster visited the school showed 20 students were enrolled in the classroom, although not every child attended every day. Two days out of the week, 20 children were scheduled to attend. Two days out of the week, 18 were scheduled to attend. One day out of the week, 17 were scheduled to attend. Two of the 20 children in the classroom were transferring out of the class in August, and one child was scheduled to start the class in September. On the days the class had 20 children, two qualified teachers would have been required. On the days 17 or 18 children were present, one teacher and one aide would have been sufficient, although the addition of one more child on the two days the class had 18 children attending would have required an additional qualified teacher.

The McMasters were looking to enroll their child two or three mornings per week. Thus, if the McMasters were not particular about which day of the week their daughter attended, they could have been enrolled on the day of the week the Ladybugs class had 17 children, as well as the days the Ladybugs class had 20 children, because 20 children would have required two qualified teachers, in which case the two teachers could have handled 21 children as well as 20 children. If, however, the McMasters wanted to enroll their daughter on the days of the week that the classroom had 18 children, and only one qualified teacher and one aide were available to staff those days, the attendance of the McMasters' child would have violated the staffing ratios. No evidence was presented as to which days the McMasters were interested in enrolling their child.

It is unclear precisely what teachers or aides were available to staff the Ladybugs classroom. There was evidence that the Ladybugs classroom had lost its two teachers, and that no replacement had been hired. Wendy Terry had been assigned to that class, but she was not a qualified teacher. The three administrative workers were qualified teachers and were available to fill in, but they still had their administrative jobs to perform, and they had to help out in other classrooms as well. Parveen Kajani was also a qualified teacher available to the Ladybugs classroom, but her schedule was sporadic because she was having family problems.

Further complicating matters was the fact that a few of the teachers were only there for the summer, and would be leaving near the end of August. Two teachers would be returning from leave, but their return dates were not set.

Plaintiff also offered more general evidence regarding the shortage of staff during the summer of 2006. Scott testified that various rooms were frequently out of compliance with staffing ratios during July 2006. Wendy Terry testified she felt the class was understaffed, and that there was not enough help in the classroom. She testified she was left alone in the classroom, even though she was not a qualified teacher. She testified the classroom violated the staffing ratios. Jessica Stribick testified that after the two teachers left the Ladybugs classroom, there were not enough teachers. There were two teachers in the classroom, but never the same ones, and the school had to pull teachers out of other classes and other schools. Suzie Aguirre also testified that the loss of the two Ladybugs teachers created staffing problems. She stated there were times when the class was out of compliance with staffing ratios.

Taken together this evidence indicates the school, and in particular the Ladybugs classroom, had a shortage of teachers, and that the only staff available to relieve this shortage was short-term and transitory. Because of the fluid nature of staffing at the school, it is difficult to determine whether the addition of one more student would have made it impossible to adequately staff the class, but given the fact the class was already operating at times in violation of the staffing ratios, and that the school was short-staffed, the jury's conclusion that the addition of one more child would have caused the classroom to operate out of compliance was a reasonable inference. That is sufficient to sustain the verdict.

B.   *Substantial Evidence Phoenix Knew of Violation*

Phoenix argues it was necessary for Scott to present evidence she disclosed to Phoenix that enrolling the McMaster child would result in a regulatory violation. Scott replies that only in a whistleblower case is it necessary for the employee to disclose to the employer the employer's violation of the law. We decline to resolve this issue because we conclude there was substantial evidence from which the jury could reasonably infer that Scott did disclose the violation to Phoenix.

Scott testified that she told her superior, Lister, on a daily basis that she needed more teachers. She also stated that the staffing problem should have been obvious because she lost two teachers out of the Ladybugs class and had

not been able to hire a replacement. Before Brohl made the decision to terminate Scott, she reviewed a written statement Scott prepared explaining the McMaster child was not enrolled because the Ladybugs room was short-staffed. Brohl acknowledged that Scott's reason for not enrolling the McMaster child was inadequate staffing, but maintained Scott never specifically claimed there were not enough teachers to comply with the teacher-student ratio.

Both Lister and Brohl demonstrated knowledge of the staffing requirements dictated by state regulation. Brohl had worked in childcare for approximately 11 years before she went to work for Phoenix in 2002. Her testimony exhibited a knowledge of the staffing requirements dictated by state regulation.

Lister had been employed by Phoenix for 10 years. Prior to that she was a teacher, then a director at another preschool. Lister's testimony demonstrated she was well versed in the regulatory staffing requirements.

The jury could have reasonably inferred that when Scott told her superiors the school was short-staffed, and that she did not enroll the McMaster child for that reason, she was in fact indicating there were not enough teachers and/or aides to maintain regulatory staffing ratios.

C. *Substantial and Fundamental Policy*

Phoenix argues the judgment should be reversed because the teacher-student ratios set forth in the administrative regulations do not embody a substantial and fundamental public policy. In support of this position, Phoenix points to the fact that the teacher-student ratio is different during nap periods, when the ratio is one teacher or one aide for every 24 children. (Cal. Code Regs., tit. 22, § 101216.3, subd. (f).) Phoenix also stresses that because the regulations are based on the number of children attending, rather than the number enrolled, an employer would not have notice that termination of an employee for refusing to enroll a child without reference to an attendance date would give rise to tort liability.

■ In this context, courts have treated the concepts of "substantial" and "fundamental" as a single requirement. (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 890, fn. 4 [66 Cal.Rptr.2d 888, 941 P.2d 1157].) In *Gantt v. Sentry Insurance, supra*, 1 Cal.4th 1083, the Supreme Court explained the rationale

for requiring a terminated employee to show violation of a substantial and fundamental public policy before recovering in tort. "[D]espite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. This determination depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy. In *Foley v. Interactive Data Corp* [(1988)] 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], we endeavored to provide some guidelines by noting that the policy in question must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer; in addition, the policy must be 'fundamental,' 'substantial' and 'well established' at the time of the discharge. (*Id.* at pp. 669–670.)" (*Id.* at p. 1090.)

"[T]he primary rationale for requiring that a public policy be substantial and fundamental is 'to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge.' [Citations.] A corollary of the substantial and fundamental requirement, then, is that a ' "constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law." ' [Citations.]" (*Sullivan v. Delta Air Lines, Inc.* (1997) 58 Cal.App.4th 938, 943 [68 Cal.Rptr.2d 584].)

The regulations governing teacher-student ratios are statutorily authorized by the California Child Day Care Facilities Act. (Health & Saf. Code, § 1596.81.) One of the express purposes of the act is a recognition that "affordable, quality licensed child care is critical to the well-being of parents and children in this state." (Health & Saf. Code, § 1596.73, subd. (e).) The Legislature also found that it was the intent of the act to ensure a quality day care environment to "contribute positively to a child's emotional, cognitive, and educational development," and that "good quality child day care services are an essential service for working parents." (Health & Saf. Code, § 1596.72, subds. (a), (e).) Manifestly, the purpose of the teacher-student ratios is to protect the safety and ensure the educational development of the children by ensuring they are adequately supervised.

The public policy embodied by the regulation at issue here is no less substantial and fundamental than other public policies courts have found sufficient to subject an employer to tort liability. In *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 297 [188 Cal.Rptr. 159], the court recognized the *Tameny* claim of an employee who was terminated after complaining about

other employees who were smoking in the workplace. The court found the safety of employees in the workplace was a fundamental and substantial public purpose. (*Ibid.*) The safety of children while in daycare is no less fundamental and substantial.

Also, in *Eisenberg v. Insurance Co. of North America* (1987) 815 F.2d 1285, the Ninth Circuit, applying California law, held that an employee who was terminated in retaliation for complaints that the company required its employees to manage too many claims had sufficiently stated a *Tameny* claim. The company required employees to handle as many as 800 claims, when the California Department of Insurance guidelines set a maximum caseload of 250 claims. (*Id.* at p. 1289.) The court held the public policy—to ensure that each insurance claim receives adequate consideration—was significant. (*Id.* at pp. 1289–1290.) The public policy of protecting children in this case is equally significant.

The regulation regarding teacher-student ratios has been in effect for over 20 years, since 1985. (Cal. Code Regs., tit. 22, § 101316.5, Register 85, No. 27 (July 6, 1985) p. 3111.)[2] The ratios are clearly set forth, and the record indicates that the administrators of Phoenix were well aware of the ratios. Thus Phoenix had adequate notice of their obligations to properly staff the classrooms.

We find no merit to Phoenix's arguments that the policies were not fundamental because the staffing ratios changed depending on the children's activities, and because the regulations are tied to attendance rather than enrollment. The fact that fewer teachers were needed during nap time did not absolve Phoenix from adequately staffing the classrooms the remainder of the school day.

Phoenix argues it had no notice that enrolling too many children could lead to liability because the regulation is tied to attendance rather than enrollment.[3] However, we assume that parents do not enroll their children unless they plan for the children to attend. Scott and Phoenix could legitimately

---

[2] The amendment allowing an aide who meets certain qualifications to increase the number of children a teacher and qualified aide can handle from 15 to 18 was added in 1994. (Cal. Code Regs., tit. 22, § 101316.5, Register 94, No. 34 (1994).)

[3] Phoenix likewise argues enrolling the McMaster child would not have violated the staffing regulations because the ratios are based on attendance rather than enrollment. Thus, they argue, Scott could have enrolled the McMaster child, and not permitted her to attend. We reject this argument for the same reason we reject the argument that Phoenix had no notice that overenrollment could lead to a violation of public policy. We assume that children are enrolled in the school for the purpose of attending class. Even though attendance on any given day may vary due to illness, vacation, and the like, the school must be prepared to staff its classrooms for the contingency that the students who are enrolled will be attending.

assume that if the McMasters enrolled their daughter, they intended for her to attend. In this context, if the school forced its employees to enroll more children than the school could legitimately accept because of staffing requirements, that may be seen as requiring the employees to violate the regulation.

■ We conclude the public policy embodied in the regulation at issue was substantial and fundamental.

## II

## Punitive Damages

Phoenix argues there was insufficient evidence of malice, fraud or oppression to support the award of punitive damages. We agree.

■ Civil Code section 3294 provides that punitive damages may be awarded in an action for breach of an obligation not arising from contract, if the plaintiff proves by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice. Here, the parties stipulated that the punitive damage instructions would contain no instruction as to fraud. Thus, the only issue is whether there was clear and convincing evidence that Phoenix was guilty of oppression or malice.

The clear and convincing standard " 'requires a finding of high probability . . . " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " [Citation.]' [Citations.]" (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1211–1212 [37 Cal.Rptr.3d 863].)

■ Malice is "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).)

Despicable conduct is conduct that is " ' ". . . so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." ' [Citation.] 'Such conduct has been described as "[having] the character of outrage frequently associated with crime." [Citation.] As well stated in *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.* (1986) 185 Cal.App.3d 1149, 1154 [230 Cal.Rptr. 276]: "[A] breach of a fiduciary duty alone without malice, fraud or oppression does not permit an award of punitive damages. [Citation.] . . . Punitive

damages are appropriate if the defendant's acts are reprehensible, fraudulent or in blatant violation of law or policy. The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate." ' [Citation.]" (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1050–1051 [117 Cal.Rptr.2d 685].)

■ Thus, in order to sustain the punitive damages award, the evidence must leave no substantial doubt that Phoenix engaged in despicable conduct, or conduct intended to cause injury to Scott. " 'Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.' [Citation.]" (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894–895 [157 Cal.Rptr. 693, 598 P.2d 854], italics omitted.)

■ The only evidence of wrongful conduct directed toward Scott was her termination for an improper reason. This evidence was insufficient to support a finding of despicable conduct, because such action is not vile, base or contemptible. Nor do we find this evidence shows a conscious and deliberate disregard of plaintiff's interests. "Conscious disregard of rights is conduct by a defendant who is aware of the probable dangerous consequences of such conduct to plaintiff's interests and wilfully and deliberately fails to avoid those consequences." (*Smith v. Brown-Forman Distillers Corp.* (1987) 196 Cal.App.3d 503, 516 [241 Cal.Rptr. 916].)

In *Smith v. Brown-Forman Distillers Corp.* the employer required the employee to commit a crime as a condition of employment. (*Smith v. Brown-Forman Distillers Corp., supra*, 196 Cal.App.3d at p. 509.) The employee was informed he could be terminated if he failed to perform the tasks, but that if he were caught performing illegal activities, he could also be terminated. (*Id.* at p. 512.) The court found there was sufficient evidence of conscious disregard of rights because the employer "knowingly placed its employees in a situation where they would engage in illegal activities because it wanted to obtain the competitive benefits of such illegal conduct, yet at the same time by paying lip service to a contrary policy, it could disavow any responsibility for such illegal conduct." (*Id.* at p. 516.) By this action, the employer protected itself at the expense of its employees, which the jury could reasonably conclude was a conscious disregard of employee rights. (*Ibid.*)

In this case, Scott was not subject to any personal liability by violating the regulation. Violation of the regulation would result in a monetary penalty imposed against the childcare center, not against Scott. (Cal. Code Regs., tit. 22, § 101195, subds. (a), (d), (e).) Thus, Scott's rights were not endangered by the school's noncompliance with the regulation.

In *Cloud v. Casey* (1999) 76 Cal.App.4th 895 [90 Cal.Rptr.2d 757], a female employee was passed over for promotion because of her gender. The court held the employer was liable for punitive damages because it denied the plaintiff a promotion based on gender, then attempted to hide the illegal reason for denying the promotion with a false explanation, and that it was this fabrication that constituted the despicable conduct. (*Id.* at p. 912.)

In *Stephens v. Coldwell Banker Commercial Group, Inc.* (1988) 199 Cal.App.3d 1394 [245 Cal.Rptr. 606], an age discrimination case, the 63-year-old plaintiff was demoted, and when his supervisor discovered he had no plans to retire, the supervisor "engaged in a program of unwarranted criticism of plaintiff's job performance to justify plaintiff's demotion." (*Id.* at pp. 1398, 1403, disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944].) The court found the unwarranted criticism to be oppressive behavior because it had no factual justification, damaged the plaintiff's reputation, and subjected the plaintiff to embarrassment. (*Stephens*, at pp. 1403–1404.)

Based upon the foregoing cases, we conclude that wrongful termination, without more, will not sustain a finding of malice or oppression. There was no evidence Phoenix attempted to hide the reason it terminated Scott. It admitted to terminating her because she would not enroll the McMaster child. Likewise, there was no evidence Phoenix engaged in a program of unwarranted criticism to justify her termination. Because there was nothing more than a wrongful termination here, punitive damages were not warranted, and the trial court should have granted defendant's motion for judgment notwithstanding the verdict on the issue of punitive damages.[4]

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] Because we have determined Scott was not entitled to punitive damages, we need not consider Phoenix's arguments that the punitive damages awarded were excessive.

*See footnote, *ante*, page 702.

## DISPOSITION

The award of punitive damages is reversed. In all other respects the judgment is affirmed. Appellant shall be awarded costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

Sims, J., and Nicholson, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 23, 2009, S175432. Werdegar, J., did not participate therein.