Filed 4/29/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| STEPHEN COLUCCI, | D075932 |
| Plaintiff and Respondent, | (Super. Ct. No. CIVDS1502822) |
| v. | |
| T-MOBILE USA, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Keith D. Davis, Judge. Affirmed in part, reversed in part, and remanded with directions.


Allen Matkins Leck Gamble Mallory & Natsis and Amy Wintersheimer Findley; Paul Hastings, Paul W. Cane, Jr., and Andrea Dicolen, for Defendant and Appellant.

Barrera & Associates, Patricio T.D. Barrera, Ashley A. Davenport; McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Plaintiff and Respondent.

T-Mobile USA, Inc. (T-Mobile) appeals a judgment entered on a $5 million jury verdict in favor of former employee Stephen Colucci in a workplace retaliation case.

T-Mobile primarily challenges the $4 million punitive damages award, arguing there is insufficient evidence that a managing agent engaged in retaliatory conduct or that the managing agent's actions were malicious or oppressive (Civ. Code, § 3294, subd. (b)). Alternatively, it argues the punitive damages award is constitutionally excessive and must be reduced. Finally, T-Mobile contends the jury's $200,000 award of damages for future emotional distress is not supported by sufficient evidence.

For the reasons discussed below, we reduce the punitive damages award to an amount that is one and one-half (1.5) times the amount awarded in compensatory damages, and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

"In summarizing the facts, we view the evidence in favor of the judgment." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693-694 (*Roby*).)

T-Mobile, headquartered in the State of Washington, sells wireless telephones and plans to consumers at retail store locations. There are hundreds of T-Mobile retail stores in California, which the company groups into smaller geographic regions and districts.

Colucci worked for T-Mobile from 2007 until 2014 as the manager of a store in Ontario, California, known as the Milliken store. As store manager, he supervised around 10 employees, participated in hiring and training these employees, conducted physical inventories, and completed other tasks to support sales. Colucci was a good employee and garnered positive performance reviews. His direct supervisor was the district manager of "Inland Empire West." Inland Empire West was comprised of about nine stores including Milliken.

2

In February 2014, Brian Robson became the new district manager of Inland Empire West. Robson was responsible for operating his district's stores and roughly 100 employees. His job duties included coaching and developing individual retail store managers; making final decisions on hiring and firing employees; and handling a wide range of operational issues in partnership with personnel from other T-Mobile departments, such as human resources (HR) and loss prevention.

As the new district manager, Robson planned to transfer Colucci from the Milliken store to a kiosk located inside the Ontario Mills mall (mall location), which had no store manager at the time. However, Colucci suffered from a medical disability—an anxiety disorder—that prevented him from performing his job in the crowded mall location. When Robson told Colucci of his plans, Colucci informed him of his disability and requested an accommodation (accommodation request). Colucci was willing to transfer to a different store not located inside a mall. Robson was highly skeptical of Colucci's condition ("this is the most ridiculous thing I've ever heard") but referred the matter to HR. An HR representative was likewise doubtful and requested a doctor's note from Colucci that described his precise limitations. Colucci obtained a medical diagnosis and physician's letter confirming his limitations. HR ultimately advised Robson that Colucci could not be transferred to the mall location due to his protected medical condition.

Several months later, in July 2014, Colucci learned that one or more of the Milliken retail sales associates was spreading inflammatory rumors and/or making defamatory statements about him (defamation incident), and Colucci asked Robson to

3

investigate. Robson agreed to do so but allowed the investigation to languish, telling Colucci he should "quit complaining" and that he had been "nothing but problems."

In the same time frame, Robson heard from a part-time Milliken sales associate (associate) that Colucci had an outside business (Auto Compound) in which he was licensed to sell used cars. The associate had recently been disciplined by Colucci due to work performance issues and was looking to transfer out of the Milliken store. According to the associate, Colucci had, at some time during the past year, used T-Mobile's resources to support Auto Compound, including occasionally using T-Mobile's fax machine and requiring the associate to answer an Auto Compound cell phone while he was on the clock at T-Mobile.[1] Based on the associate's report, Robson promptly initiated an investigation of Colucci with the help of a loss prevention manager.[2]

On July 21, 2014, Colucci called T-Mobile's "integrity line" (a designated means for employees to report workplace issues) to notify the company of the unresolved defamation incident. After the defamation incident, the work environment in the store had been tense and uncomfortable.

---

[1] At trial, the associate's statements were largely discredited. The associate had never been an employee of Auto Compound and was not required to do any Auto Compound work.

[2] Colucci's prior supervisor at T-Mobile was aware of Auto Compound and had even referred someone to Colucci for advice on used cars. This supervisor never had any concerns about Colucci's side business or that Colucci was misusing T-Mobile's resources.

Around noon on July 22, 2014, Robson and the loss prevention manager visited the Milliken store, intending to interview Colucci about Auto Compound. However, they did not have an opportunity to complete any interview or tell Colucci why they were there. Colucci was experiencing severe back pain that day, for which he later required surgery. His back pain was aggravated by anxiety over the tense work environment. Colucci complained to Robson, stating his (1) distress over Robson's failure to resolve the defamation incident and (2) his belief that Robson was treating him unfairly due to his medical condition and accommodation request. Colucci requested that he be permitted to go on a medical leave of absence. Robson responded that it was Colucci's "right" to take medical leave, and he approved Colucci's taking the rest of the day off. Colucci left the premises.

Unknown to Colucci, about two hours after he left the Milliken store premises, Robson recommended to HR that T-Mobile terminate Colucci for "cause"—a conflict of interest. In making this decision, Robson admittedly bypassed T-Mobile's progressive discipline policy, which might have included a warning or less severe consequence before resorting to termination. Information about the alleged conflict of interest had come almost entirely from the associate; at no point did anyone speak to Colucci about a purported conflict. Robson claimed that Colucci knowingly refused to be interviewed about it. Robson and HR exchanged communications about the pending termination.

Between July 23 and 24, consistent with his last conversation with Robson and still unaware of any pending termination, Colucci submitted a formal request to HR for a medical leave of absence. Colucci also lodged a second complaint to the integrity line,

5

reporting that Robson was discriminating against him and neglecting to resolve the defamation incident. Undeterred, Robson proceeded with processing Colucci's termination.

On July 25, Robson prepared and mailed Colucci a letter informing him of his employment termination, bearing an effective date of July 22, 2014, per HR's instructions.[3] On July 28, the loss prevention manager who had been assisting Robson reported to his colleagues during a weekly staff call that Colucci had been "turned into a customer" (internal company jargon for firing an employee) because of his complaints or the way he had acted. The loss prevention manager made no mention on the call that Colucci was terminated due to a conflict of interest.

In February 2015, Colucci filed a complaint against T-Mobile. Of relevance here, he alleged a cause of action for retaliation in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (h)). In 2017, the cause was tried to a jury, which received evidence regarding the workplace events we have described. In addition, the jury received evidence regarding Colucci's post-termination life, including the immense, ongoing toll of the termination on his mental and physical health, and his struggle to find comparable employment. Finally, the jury heard expert witness testimony regarding (a) the prognosis on Colucci's mental condition, and (b) his past and future economic losses, i.e., lost earnings and benefits.

---

[3]     According to T-Mobile, Colucci's termination was made effective on July 22 because that was the date Robson recommended termination. According to Colucci, T-Mobile backdated his termination date to July 22 so that it appeared as if he was terminated prior to his second integrity line complaint.

The jury returned a unanimous verdict in Colucci's favor on his claim of retaliation. It awarded $1,020,042 in total compensatory damages as follows: (A) $130,272 for past economic losses; (B) $189,770 for future economic losses;[4] (C) $500,000 for past noneconomic damages and/or emotional distress; and (D) $200,000 for future noneconomic damages and/or emotional distress.

In a bifurcated proceeding on punitive damages, the parties stipulated that the jury would receive certain information about T-Mobile's financial condition. For 2015 and 2016, respectively, T-Mobile had: total revenue of $32.1 and 37.2 billion; net income of $733 million and $1.460 billion;[5] free cash flow of $690 million and $1.433 billion; and total assets of $62.4 and $65.9 billion. Colucci's counsel argued that T-Mobile generated $4 million in net income in one day, based on its 2016 net income of $1.460 billion divided by 365 days.

---

4    The jury's award for economic losses, totaling $320,042, corresponded to figures that Colucci's expert economic witness provided in his testimony.

5    The reporter's transcript of the party's stipulation contains an error. The reporter's transcript, volume 7, page 1591, line 15, states that T-Mobile's 2016 net income was $28,460,000,000, or $28.460 billion. However, Colucci's counsel repeatedly stated, without any objection or correction from defense counsel, that T-Mobile's net income for 2016 was $1.460 billion. $1.460 billion divided by 365 days equals $4 million of net income per day, which is not coincidentally what the jury awarded in punitive damages. Thus, we believe the parties stipulated that T-Mobile's net income for the year 2016 was $1.460 billion.

The jury awarded $4 million in punitive damages, and the trial court entered judgment accordingly. Later, the court denied T-Mobile's motions for new trial and for judgment notwithstanding the verdict. This appeal followed.[6]

DISCUSSION

I. *Substantial Evidence Supports an Award of Punitive Damages*

At trial, Colucci argued that Robson was a managing agent of T-Mobile and that Robson's actions were committed with malice or oppression. The jury agreed, finding clear and convincing evidence that Colucci was entitled to punitive damages. On appeal, T-Mobile contends there is insufficient evidence to support either (1) that Robson was a managing agent of T-Mobile, or (2) that he engaged in acts of malice or oppression.

A. *Standard of Review*

A jury may award punitive damages in a tort action "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) On appeal, a jury's decision to award punitive damages must be upheld if it is supported by substantial evidence. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 821 (*Egan*) ["Determinations related to assessment of punitive damages have traditionally been left to the discretion of the jury"].) Because our review is for substantial evidence, we are bound to consider the evidence in the light most favorable to the prevailing party, giving him the benefit of

---

6 On appeal, T-Mobile has requested judicial notice of three briefs filed by Colucci's counsel's law firm in three completely unrelated cases. The matter is not relevant. T-Mobile's request for judicial notice is denied.

every reasonable inference, and resolving conflicts in support of the judgment.  However, since the jury's findings were subject to a heightened burden of proof, we review the record in support of these findings in light of that burden.  Thus, we inquire whether the record contains " ' "substantial evidence to support a determination by clear and convincing evidence. . . ." ' "  (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40.)

B.       *Managing Agent*

Civil Code section 3294, subdivision (b), provides in pertinent part:  "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer . . . was personally guilty of oppression, fraud, or malice.  With respect to a corporate employer, the . . . act of oppression, fraud, or malice *must be on the part of an officer, director, or managing agent of the corporation*."  (Italics added.)  At issue in this case is whether Robson was a "managing agent"—a term with no statutory definition.

In the seminal case of *White v. Ultramar* (1999) 21 Cal.4th 563 (*White*), our high court construed managing agent as follows:  "[T]he Legislature intended that principal liability for punitive damages not depend on employees' managerial level, but on the extent to which they exercise substantial discretionary authority over decisions that ultimately determine corporate policy.  Thus, supervisors who have broad discretionary powers and exercise substantial discretionary authority in the corporation could be managing agents.  Conversely, supervisors who have no discretionary authority over decisions that ultimately determine corporate policy would not be considered managing agents even though they may have the ability to hire or fire other employees.  In order to

9

demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at pp. 576-577.)

The *White* court went on to discuss how "Salla," who supervised the wrongfully terminated plaintiff/employee, was a managing agent of corporate defendant Ultramar. Ultramar owned convenience stores at gas stations throughout California. (*White*, *supra*, 21 Cal.4th at p. 577; *id.* at p. 580.) Salla was a "zone manager," responsible for managing eight stores in the San Diego area and at least 65 employees. (*Id*. at p. 577.) Individual store managers reported to her. (*Ibid*.) Salla's superiors "delegated most, if not all, of the responsibility for running these stores to her. The fact that Salla spoke with other employees and consulted the human resources department before firing plaintiff does not detract from her admitted ability to act independently of those sources." (*Ibid*.) In managing numerous stores on a daily basis and making significant decisions affecting both store and company policy, the court concluded that "Salla exercised substantial discretionary authority over decisions that ultimately determined corporate policy. . . ." (*Ibid*.; see also *id.* at pp. 583-584 (conc. opn. of Mosk, J.) ["Salla had sufficient discretion to take actions that necessarily resulted in the ad hoc formulation of policy over the aspect of the corporation's business giving rise to plaintiff's cause of action"].)

The facts of *White* are practically indistinguishable from the facts of this case. Robson was a district manager, responsible for managing nine retail stores and 100 employees. Individual store managers reported to him, and he in turn reported to a more

10

senior manager.  Robson had independent, final authority to hire or fire employees within his district; indeed, he alone decided to fire Colucci.  Further, as in *White*, Robson had substantial discretionary authority over daily store operations, which led to the ad hoc formulation of policy.  For example, Robson decided whether and where to transfer employees; whether to institute disciplinary measures; and whether and how to investigate employees' reported concerns.  These decisions affected company policy over a significant aspect of T-Mobile's business.

T-Mobile's primary counterargument is that Robson was not in a high enough position to determine official corporate policies, i.e., he was not a corporate policymaker.  T-Mobile posits that managing agents must be *corporate* policymakers and "policies" in this context refers only to "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." (*Roby*, *supra*, 47 Cal.4th at p. 715.)  In its reply brief, T-Mobile argues that the California Supreme Court's decision in *Roby*, at pages 714-715, limited or disapproved *White* on this precise point.

In *Roby*, which was a harassment and discrimination case, the supervisor in question (Schoener) worked at one of the company's distribution centers and supervised four employees in a company of over 20,000.  (*Roby*, *supra*, 47 Cal.4th at p. 714.)  The court, in addressing *White*, was not reviewing whether substantial evidence supported the jury's decision to award punitive damages, but rather the constitutionality of the amount of the jury's award.  (*Id*. at pp. 712, 714.)  In deciding whether the award was excessive under the due process clause, the court analyzed the corporation's degree of

11

reprehensibility, noting that Schoener did not have "broad authority" in determining formal corporate policies. (*Id*. at p. 715.) However, two mid-level managers, one of whom was the *head* of the distribution center where plaintiff and Schoener worked, had become aware of Schoener's discriminatory conduct and did nothing to correct it. (*Ibid*.) The court therefore assumed without deciding that at least one of the *mid-level managers* was a managing agent. (*Ibid*.) Although that person's inaction was wrongful, the court concluded the corporation's reprehensibility, in totality, was on the low end of the range of wrongdoing. (*Id*. at p. 717.)

Read in context and considering what was actually at issue in *Roby*, we do not believe the California Supreme Court intended to modify or limit *White*'s careful formulation of the managing agent test. Before *White*, our high court already rejected the view that a managing agent must be involved in " 'high-level policymaking.' " (*Egan*, *supra*, 24 Cal.3d at p. 822.) Instead, the "determination whether employees act in a managerial capacity . . . does not necessarily hinge on their 'level' in the corporate hierarchy. . . . [T]he critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." (*Id*. at pp. 822-823.) In *Egan*, the court upheld the finding that two claims managers were managing agents of the defendant insurance company. The court opined that a corporate defendant " 'should not be allowed to insulate itself from liability by giving an employee a nonmanagerial title and relegating to him crucial policy decisions.' " (*Id*. at p. 823.)

We have considered all the cases cited by T-Mobile and are not persuaded by its argument that only T-Mobile's corporate leaders who played a role in setting official

12

corporate policies—e.g., those contained in an employee handbook—could be considered managing agents. (See, e.g., *Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 164, 168 [security guard and his immediate supervisor, both of whom were subordinate to the store's general manager, were not managing agents]; *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 63 [no substantial evidence presented regarding vice-president's duties or authority].) Courts evaluate numerous factors in the "managing agent equation . . . in determining whether the supervisor was a managing agent whose conduct could justify awarding punitive damages against his employer." (*White*, *supra*, 21 Cal.4th at p. 574, citing with approval *Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397.) Managing agents are not limited to those individuals with the ability to set handbook policies. (E.g., *White*, *supra*, 21 Cal.4th at p. 577 [manager of eight retail stores]; *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 370 [onsite project manager for construction company]; *Hobbs v. Bateman Eichler, Hill Richards* (1985) 164 Cal.App.3d 174, 193 [office manager of brokerage firm].)

T-Mobile argues that Robson could not be considered a policy setting managing agent based solely on his deviations from T-Mobile's official company policy, such as discharging Colucci despite the company's progressive discipline policy or sending Colucci a termination letter even though managers were not supposed to communicate with employees who had requested medical leave. However, based on our review of the record, Robson had substantial discretionary authority to override these general policies. For example, T-Mobile's progressive discipline policy arguably might have prevented Colucci's firing had it been followed, but Robson testified that discipline was not

13

*required* to be progressive under the policy and that *he* decided the appropriate action to take, depending on the circumstances. Likewise, Robson testified that management "typically" would not communicate with employees once they requested leaves of absences, but he could situationally deviate. Robson suffered no consequences for deviating from these policies and indeed, was authorized to do so. Accordingly, Robson formulated operational policies through his discretionary decisions. (*White*, *supra*, 21 Cal.4th at p. 577.)

In summary, we conclude substantial evidence supports the jury's finding that Robson was a managing agent whose conduct could justify an award of punitive damages against T-Mobile.

C. *Malice or Oppression*

T-Mobile next contends that, even assuming Robson was a managing agent, there was insufficient evidence to show he acted with malice or oppression as required to support an award of punitive damages. (Civ. Code, § 3294, subd. (a).) In this context, our task is to determine whether substantial evidence supports the jury's finding, by clear and convincing evidence, that Robson's actions were malicious or oppressive. (*Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1287-1288 (*Tomaselli*).)

"Malice" is defined as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others"; "oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c).) " 'Despicable conduct' " is " 'conduct

14

which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people.' " (*Tomaselli, supra,* 25 Cal.App.4th at p. 1287.) " ' The mere carelessness or ignorance of the defendant does not justify the imposition of punitive damages. . . . Punitive damages are proper only when the tortious conduct rises to levels of extreme indifference to the plaintiff's rights, a level which decent citizens should not have to tolerate.' " (*Ibid.*)

Based on our review of the record, we conclude substantial evidence supports the jury's finding that Robson acted with malice or oppression. "Malice and oppression may be inferred from the circumstances of a defendant's conduct." (*Monge v. Superior Court* (1986) 176 Cal.App.3d 503, 511.) Here, the jury could reasonably infer from the evidence that Robson became angered by Colucci's complaints and decided to concoct a reason for termination, all the while knowing Colucci was in a weak physical and mental state. None of Robson's actions strike us as inadvertent or careless; even if his initial termination recommendation was hasty, he had several days to reevaluate and reverse his decision. He did not. Moreover, the jury could consider it despicable of Robson to allow Colucci, who was suffering severe back pain, to leave the store under the belief that he was permitted to go on medical leave, and then turn around and use Colucci's inability to complete an interview that day as a basis for firing him. The record supports that Robson willfully and consciously retaliated against Colucci, in violation of Colucci's right to complain of discrimination. (Cf. *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 220-221 [punitive damages recoverable under Civ. Code § 3294 in racially-motivated terminations].)

15

T-Mobile cites *Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702 (*Scott*), in support of its position that Robson did not act with requisite malice or oppression. The plaintiff in *Scott* was a preschool teacher who was terminated by the employer/school due to her decision not to enroll one child in the school, which was part of her job duties. (*Id*. at p. 707.) At trial, the plaintiff established that enrolling the child would have violated the state mandated teacher-student ratio, e.g., one teacher for every 12 children. (*Id*. at pp. 709-711.) The jury found that it was wrong to terminate plaintiff for this reason and awarded punitive damages. (*Id*. at pp. 708, 715.) The Court of Appeal affirmed the judgment but reversed the award of punitive damages, explaining that the school's conduct did not rise to the level of malice or oppression: "[W]rongful termination, without more, will not sustain a finding of malice or oppression. There was no evidence [the school] attempted to hide the reason it terminated Scott. It admitted to terminating her because she would not enroll the [particular] child. Likewise, there was no evidence [the school] engaged in a program of unwarranted criticism to justify her termination." (*Id.* at p. 717.)

The facts of *Scott* are readily distinguishable. There, the employer was forthright about its reason for terminating the plaintiff, but the reason was found improper because it would violate a significant public policy of protecting children. (*Scott*, *supra*, 175 Cal.App.4th at pp. 714-715.) In contrast, there is evidence in this case that T-Mobile attempted to hide its reason for terminating Colucci. Supervisor Robson did not ever admit he was retaliating against Colucci because Colucci had complained about him; Robson maintained that the only reason Colucci was terminated was due to a conflict of

16

interest. As we have noted, the jury could infer that the conflict-of-interest rationale was contrived for many reasons, including that no one at T-Mobile had even asked Colucci about the underlying facts of the supposed conflict prior to firing him.[7] Consequently, the jury in this case could reasonably find that Robson's retaliatory conduct was malicious or oppressive. (*Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912 [evidence that a decision maker attempted to hide an improper basis for termination with a false explanation is contemptible and supports a finding of willful conduct].)

II. *The Amount of Punitive Damages Is Excessive and Must Be Reduced*

Even if the jury was entitled to award some amount of punitive damages, T-Mobile contends that the jury's $4 million award is constitutionally excessive in violation of the federal due process clause. Our review is de novo. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*).)

"The due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages." (*Roby*, *supra*, 47 Cal.4th at p. 712.) An award of grossly excessive or arbitrary punitive damages is constitutionally prohibited because due process entitles a defendant to fair notice of both the conduct that will subject it to punishment and the severity of the penalty that may be

---

[7] Colucci established at trial that numerous T-Mobile employees had side businesses. We have not attempted to summarize all the facts Colucci adduced to discredit T-Mobile's conflict-of-interest rationale; suffice it to say, the factual justification for a conflict of interest was highly tenuous. For example, T-Mobile's electronic access policy actually allowed employees to occasionally use T-Mobile's equipment for personal reasons. In addition, multiple witnesses testified that they had never seen Colucci selling used cars during work hours.

17

imposed for the conduct. (*State Farm Mutual Automobile Insurance Co. v. Campbell* (2003) 538 U.S. 408, 416-417 (*State Farm*); *Simon*, *supra*, 35 Cal.4th at p. 1171.) "Eschewing both rigid numerical limits and a subjective inquiry into the jury's motives," the Supreme Court set forth "a three-factor weighing analysis looking to the nature and effects of the defendant's tortious conduct and the state's treatment of comparable conduct in other contexts." (*Simon*, at pp. 1171-1172.)

In reviewing the amount of a punitive damages award, a court must "consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm*, *supra*, 538 U.S. at p. 418.) We address these guideposts in turn.

A.      *Degree of Reprehensibility*

" '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' [Citation.] We have instructed courts to determine the reprehensibility of a defendant by considering whether: [(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm, supra,* 538 U.S. at p. 419.) "It should be presumed a plaintiff has been made whole for his injuries by

18

compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." (*Ibid*.)

With respect to the first of these reprehensibility factors, the harm to Colucci was "physical" in the sense that it negatively impacted his emotional and mental health, rather than being a purely economic harm. (*Roby, supra,* 47 Cal.4th at p. 713.) With respect to the second reprehensibility factor, it was objectively reasonable to assume that employer T-Mobile's retaliation against Colucci would affect his emotional well-being, and therefore T-Mobile's " 'conduct evinced an indifference to or a reckless disregard of the health or safety of others.' " (*Ibid.*)

Colucci does not meaningfully address the third or fourth reprehensibility factors. He does not contend he was financially vulnerable. As to whether T-Mobile's conduct was repeated or isolated, we conclude Robson's retaliatory conduct toward Colucci was an isolated incident. There is no indication in the record that T-Mobile engaged in repeated acts of retaliation. (See *Roby*, *supra*, 47 Cal.4th at pp. 713-714.)

With respect to the fifth reprehensibility factor, the jury necessarily determined that Colucci's harm was the result of T-Mobile's intentional malice; that is, Robson's malice was imputable to T-Mobile through his managing agent status. This distinguishes our case from *Roby*, where the court explained that the conduct of the managing agents was not intentional and amounted at most to a conscious disregard of the rights of others. (*Roby*, *supra*, 47 Cal.4th at p. 716.) Nevertheless, we are convinced, as in *Roby*, that

19

T-Mobile's conduct in this case did not rise to the kind of oppressive or malicious conduct that has in the past justified large punitive damages awards. (*Id.* at p. 717 [summarizing egregious conduct causing deaths or severe injuries, and a case involving repeated outrageous acts of sexual harassment].) Notwithstanding the harm to Colucci from Robson's actions, there is no hint in the record that T-Mobile engaged in a calculated *pattern* of retaliation against its employees. In fact, it was undisputed that T-Mobile maintained an integrity line to receive employee complaints; the company had a variety of policies and procedures ostensibly designed to prevent workplace misconduct; and managers and employees were trained on T-Mobile's employment policies.

Taking into account all five reprehensibility factors set out in *State Farm*, *supra*, 538 U.S. at page 419, we conclude that T-Mobile's conduct warrants the imposition of sanctions to achieve punishment or deterrence, but the reprehensibility of T-Mobile's conduct was in the low to moderate range of wrongdoing that can support an award of punitive damages under California law.

B.      *Ratio of Punitive Damages to Actual or Potential Harm*

Regarding the second guidepost, the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff [i.e., compensatory damages] and the punitive damages award." (*State Farm, supra,* 538 U.S. at p. 424.) Yet "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*Id*. at p. 425.) In general, a higher ratio might be necessary where the plaintiff's injury

was hard to detect, or the monetary value of noneconomic harm might have been difficult to determine. But "[w]hen compensatory damages are substantial, then a lesser ratio, *perhaps only equal to compensatory damages*, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm*, *supra*, 538 U.S. at p. 425, italics added.)

Here, the jury's award of compensatory damages was substantial. The jury decided Colucci was entitled to a total of $1,020,042 in compensatory damages, the substantial majority of which was for noneconomic harm and/or emotional distress ($700,000). The jury's award for noneconomic harm "may have reflected the jury's indignation at [T-Mobile's] conduct, thus including a punitive component."[8] (*Roby*, *supra*, 47 Cal.4th at p. 718.) We are cognizant that a large amount of damages awarded for emotional distress may itself serve as a deterrent to further corporate misconduct. (*Ibid*.) In *Roby*, at page 719, the court applied a one-to-one ratio between punitive and compensatory damages where there was relatively low corporate reprehensibility and a substantial award of noneconomic damages. Given the low to moderate range of reprehensibility of T-Mobile's conduct here, we conclude that a 1.5-to-one ratio between punitive and compensatory damages is the federal constitutional maximum.

---

[8]    We discuss in section III, *infra*, that substantial evidence supports the jury's award of $200,000 for future damages.

C.    *Comparable Civil Penalties*

The final guidepost requires us to compare the difference between the punitive damages award and the " 'civil penalties authorized or imposed in comparable cases.' " (*State Farm*, *supra*, 538 U.S. at p. 428.)  T-Mobile points us to the $300,000 maximum award for combined emotional distress and punitive damages in a federal Title VII case. Colucci responds convincingly that a Title VII claim is not an appropriate comparison due to the lower standard of proof to prevail on such a claim.  In *Roby*, the court looked to the maximum administrative fine the plaintiff could have obtained had she pursued her FEHA claim before the Fair Employment and Housing Commission (Gov. Code, § 12970, subd. (a)(3)), which is $150,000.  (*Roby*, *supra*, 47 Cal.4th at pp. 718-719.)  The parties have not briefed whether such an administrative fine is a fair comparison, and accordingly, we do not consider it.  T-Mobile has not established a relevant civil penalty for comparison purposes.

D.    *Conclusion*

Based on the foregoing, we conclude that a 1.5-to-one ratio between punitive and compensatory damages is the federal constitutional maximum in this case.  We are primarily guided by T-Mobile's low to moderate degree of reprehensibility.  In addition, Colucci's compensatory award appeared to already contain a punitive component. Finally, we have reviewed evidence of T-Mobile's financial condition and are satisfied that a $1,530,063 punitive damages award (1.5 times compensatory damages of $1,020,042) achieves an appropriate deterrent effect.  (*Roby*, *supra*, 47 Cal.4th at p. 719.)

III. *Substantial Evidence Supports the Award of Damages for Future Emotional Distress*

T-Mobile's final argument on appeal is that no evidence supports the jury's $200,000 award for future noneconomic harm and/or emotional distress. We disagree.

To recover future damages, a plaintiff must prove that his or her detriment is reasonably certain to result in the future. (Civ. Code, § 3283; *Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 995, disapproved on other grounds in *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664.) "While there is no clearly established definition of 'reasonable certainty,' evidence of future detriment has been held sufficient based on expert medical opinion which considered the plaintiff's particular circumstances and the expert's experience with similar cases." (*Bihun*, at p. 995.) However, expert testimony is not required in all cases. For example, it is unnecessary if the injury is such that the jury could conclude, based on all the evidence and relying upon its own experiences and common knowledge, that the future harm is reasonably certain to occur. (*Mendoza v. Rudolf* (1956) 140 Cal.App.2d 633, 636 [involving future pain and suffering from car accident].) Courts have affirmed a jury's finding of future damages based on the plaintiff's testimony of continued pain and suffering at the time of trial. (*Loper v. Morrison* (1944) 23 Cal.2d 600, 611 [plaintiff's testimony that at the time of trial she was still suffering from headaches, nervousness and pain]; *Parsell v. San Diego Consol. Gas & Electric Co.* (1941) 46 Cal.App.2d 212, 216 [plaintiff's testimony that two years after accident she still had little, if any, use of her hand and arm].)

In this case, Colucci's expert psychologist testified that Colucci had, in 2016, reported symptoms associated with depression and/or a "thought disorder," which the

psychologist attributed to Colucci's termination from T-Mobile. The psychologist opined at trial that Colucci was "improved" insofar as his "depression all the time" had turned to "periodic depression" and that Colucci "hadn't quite recovered, but he was doing much better[.]" Importantly, the psychologist believed that Colucci would continue to suffer "residual issues" until he could "reconstitut[e] his work in a [more fulfilling] situation . . . ."

The jury heard from Colucci at trial that he had gained up to 100 pounds after being terminated by T-Mobile in 2014; he became depressed, lethargic, and sad; without a job, he was inactive and engaging in unhealthy eating habits; and he suffered stomach problems that disturbed his sleep. Colucci subsequently found a new job, but he made significantly less money, the job had limited growth potential, and he had to travel for his new job, which he viewed as a "big sacrifice" to his home life. As of trial, Colucci testified he had lost "some" but not all the weight he had gained and was still stressed and "depressed at times" about his wrongful termination from T-Mobile. His emotional distress was continuing to manifest physically in the form of stomach discomfort, sleeplessness, and rashes. The jury heard Colucci's testimony first-hand, evaluated his physical appearance, and was shown pictures of his stress-induced rashes.

Based on all this evidence, a jury could reasonably infer that Colucci would continue to suffer emotional distress after the trial concluded. Consistent with the evidence, the jury awarded substantially less in damages for future harm than it did for past harm. T-Mobile mischaracterizes the state of the evidence, arguing that Colucci's psychologist admitted Colucci was "fully recovered" by the time of trial. The

24

psychologist did not state that Colucci was "fully recovered"; moreover, the jury was free to discount any of the psychologist's minimizing statements and credit Colucci instead, who testified unequivocally that he was continuing to suffer depression, stress, sadness, and anxiety over being terminated. His testimony was not esoteric; based on its own experiences, the jury could fairly evaluate the extent of Colucci's future suffering over his derailed career. Substantial evidence supports the jury's award of damages for future noneconomic harm and/or emotional distress.

T-Mobile speculates that the reason the jury awarded any amount of damages for future harm was because of non-discharge-related reasons, e.g., because of Colucci's anxiety disorder that predated his discharge. These were factual disputes to be resolved by the jury, and T-Mobile does not contend any instructions were erroneous. Because the award for future damages is supported by substantial evidence, we have no basis to reverse it.

DISPOSITION

The punitive damages portion of the judgment against T-Mobile is reversed, and the matter is remanded to the trial court with directions to modify the punitive damages award to $1,530,063, representing a ratio of 1.5 times the amount awarded in compensatory damages.  In all other respects, the judgment is affirmed.  The parties are to bear their own costs on appeal.


DATO, J.

WE CONCUR:


BENKE, Acting P. J.


GUERRERO, J.

26