Filed 1/2/24  Rudnicki v. Farmers Insurance Exchange CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ANDREW RUDNICKI,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>FARMERS INSURANCE EXCHANGE et al.,<br><br>Defendants and Appellants. | B321691<br><br>(Los Angeles County<br>Super. Ct. No. BC630158) |

APPEALS from a judgment of the Superior Court of Los Angeles County.  Ruth Ann Kwan, Judge.  Affirmed in part and dismissed in part.

Shegerian & Associates, Carney R. Shegerian and Jill McDonell for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Julian W. Poon, Jeremy S. Smith, Patrick J. Fuster, Matthew N. Ball and Yan Zhao for Defendants and Appellants.

_____

Andrew Rudnicki (Rudnicki) brought this wrongful termination action against his former employers, Farmers Insurance Exchange (FIE) and Farmers Group, Inc. (FGI) (collectively Farmers). Following a 24-day trial, the jury found in favor of Rudnicki on his claim for retaliation, awarding him $5.4 million in compensatory damages and $150 million in punitive damages. The trial court reduced the punitive damage award to $18.9 million, but left the rest of the verdict standing.

Farmers appeals, first arguing that we should reverse the judgment on liability because (1) Rudnicki could not prevail on a claim for retaliation; and (2) the trial court issued certain erroneous evidentiary rulings. Alternatively, if we do not reverse on liability, Farmers asks us to eliminate or substantially reduce the damage award.

Because Farmers's arguments are unconvincing, we affirm the judgment. It follows that Rudnicki's protective cross-appeal is dismissed as moot.

# FACTUAL[1] AND PROCEDURAL BACKGROUND

*Rudnicki's employment*

Farmers hired Rudnicki in 1979. He worked his way up as a trial lawyer to supervising attorney, comanaging the Los Angeles office, and divisional supervisor. In 2013, he was promoted to senior vice president of claims litigation (meaning head of claims litigation) and led Farmers's branch legal offices (BLO's). The BLO's provide legal representation to Farmers's insureds. In this role, Rudnicki was responsible for outside counsel that represented Farmers's insureds, legal bill review, and legal vendors.

Initially, Rudnicki's department reported to Farmers's general counsel. But in 2008 or 2009, the department began reporting to FIE's chief claims officer, Keith Daly (Daly).

*Female attorneys' 2013 inquiries regarding gender disparity*

In 2013, Lisa Sepe-Wiesenfeld reported to Rudnicki, who tasked her with participating on a conference call with multiple attorneys to address some of their gender-based concerns regarding women in leadership/promotions. Participants included Catherine Meta Pugh (Pugh), who worked in human resources (HR), and attorneys Christine Campbell (Campbell), Karen Wasson (Wasson), and Bethany Soule (Soule). Rudnicki then had multiple phone conversations with these three attorneys (Campbell, Wasson, and Soule) regarding gender issues.

---

[1] "In summarizing the facts, we view the evidence in favor of the judgment." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693–694 (*Roby*).)

In September 2013, Soule e-mailed Wasson, "Andy said he was considering asking [Pugh] to run the numbers to determine if women were paid equally to men," and thought "there might be some disparity."

Rudnicki asked Pugh for demographic information about women versus men in leadership, particularly in claims litigation; Rudnicki requested pay information to determine if a pay differential existed. Pugh had access to the information but needed Suzanne Elliott's (Elliott) approval. Elliott apparently then went to Laura Rock (Rock) for approval.[2] At the time they discussed whether to provide this information to Rudnicki, Elliott and/or Rock "rais[ed] the concern that release of this data could possibly expose Farmers to liability." Ultimately, both Elliott and Rock refused the request.

*Coates* class action

On April 29, 2015, Lynne Coates filed a class action lawsuit against Farmers (*Coates*), alleging, inter alia, that "Farmers systematically pays female attorneys less than similarly-situated male attorneys. Not only are male attorneys paid more, they are routinely given higher profile work assignments; are given raises and promotions more frequently; and are recognized for their accomplishments while female attorneys are not. In general, Farmers advances the careers of its male attorneys more quickly while treating its female attorneys more like support staff." In October or November of that year, Wasson became the lead plaintiff in *Coates*.

---

[2]    At the time, Elliott and Rock were both high level HR employees. Elliott was a head HR business partner for claims, and Rock was FGI's HR head.

4

Farmers retained Paul Hastings, LLP (Paul Hastings) to represent it in the *Coates* action.

*Rudnicki's intended deposition testimony*

In late 2015, Rudnicki went to Daly's office to explain that he had been prepared by Paul Hastings and expected to give a deposition in *Coates*; he stated that he would be testifying about what he believed were some HR failures, specifically, the fact that the gender disparity issue had been raised and that HR denied his requests for gender demographics and pay disparity documents in 2013.[3]  Daly became red-faced and agitated.  Daly unhappily said something like "I don't see that you need to testify about that."  Rudnicki replied that he did not get to dictate which questions were asked of him.

Daly testified at the trial in this matter that he knew that Rudnicki was going to be deposed in *Coates*.  He agreed that had Rudnicki testified that he believed a pay disparity existed but documentation about it had been refused, that could have been potentially "very bad" for Farmers.

*Daly's treatment of Rudnicki changes*

On December 22, 2015, Daly sent Rudnicki an e-mail titled "Seasons greetings" and attaching an article:  "Insurer facing class action threat in California."  Rudnicki took the e-mail sarcastically; Daly agreed that it was not a greeting.

---

[3]     In a declaration filed in support of Farmers's motion for summary judgment, Daly declared:  "Rudnicki certainly never told me that he had previously escalated gender concerns" or that HR denied that request.  At trial, Daly admitted that this was false.

5

Thereafter, Daly treated Rudnicki with an icy chill. For example, in February and March 2016, Daly did not ask Rudnicki to speak at Farmers's big conference, even though he had spoken there every year for the preceding 10 years. At another event, when every other department head was asked to speak, Rudnicki was excluded.

*The Coates litigation settles*

The *Coates* litigation settled in principle on April 13, 2016, before Rudnicki was ever deposed.

*Termination of Rudnicki's employment*

One month later, on May 13, 2016, Farmers terminated Rudnicki's employment.[4] When asked for a reason, Daly and Elliott told Rudnicki that there were "HR issues" and that he was responsible for the *Coates* settlement. Elliott told Rudnicki that his "behavior ha[d] become a risk to the organization." But, Daly did not review Rudnicki's personnel file before terminating his employment; he was only familiar with his own reviews of Rudnicki. Elliott also did not review Rudnicki's personnel file before Rudnicki's employment was terminated.[5]

---

[4] The evidence was inconsistent regarding who was involved in the decision to terminate Rudnicki's employment. At one point, Daly testified that he discussed it with FGI's chief executive officer and chairman of the board Jeffrey Dailey (Dailey) and FGI's general counsel, Steven Weinstein. Daly also testified that the only two people involved in the decision to terminate Rudnicki's employment were Daly and Elliott.

[5] Deborah Aldredge (Aldredge), FGI's chief administrative officer since 2013, testified that Farmers does not necessarily require review of a personnel file in executive terminations, but it

6

*Rudnicki's lawsuit*

On August 10, 2016, Rudnicki filed the instant lawsuit, alleging nine causes of action against Farmers. Only five claims survived Farmers's motion for summary judgment/adjudication: (1) age discrimination, (2) gender discrimination, (3) disability discrimination, (4) retaliatory termination, and (5) a derivative claim for wrongful termination.

As is relevant to the issues in this appeal, the retaliation claim, as set forth in the operative first amended complaint,[6] alleges that in or around 2014, "a few female attorneys from Farmers' in-house legal department brought a class action against Farmers. The women alleged that they were underpaid compared to the men in the same departments. This simply was not true." After Farmers retained Paul Hastings to represent it in the *Coates* litigation, *Coates* settled. "Right after the settlement, Rudnicki was fired."

*Pretrial evidentiary rulings*

A. Rudnicki's comment about his potential deposition testimony in *Coates*

Prior to trial, Farmers moved to exclude testimony from Rudnicki about his conversation with Daly about his potential deposition testimony in *Coates*; according to Daly, that conversation did not occur. The trial court denied Farmers's motion, reasoning that notwithstanding Rudnicki's role as in-

---

was Farmers's practice to review personnel files pretermination as a component of the decision.

[6]     Portions of the pleading are redacted.

house counsel, he was merely "telling his superior, as a witness, this is what [he] intend[s] to testify."

B. Alleged instances of Rudnicki's mistreatment of women at work

Rudnicki moved to exclude evidence of his prior misconduct, including inappropriate comments and behavior towards female employees. According to Farmers, this evidence would have corroborated Daly's stated reasons for firing him and significantly undermined Rudnicki's claims of pretext. The trial court ruled that Farmers could rely only on Daly's stated reasons to show a lack of retaliatory motive, because evidence of Rudnicki's other bad acts would be "more prejudicial than probative" and an "undue consumption of time." But, the trial court cautioned that Rudnicki's counsel could not "open the door to character evidence of what a great leader he is and how much we love him." "[I]f [Rudnicki's counsel] ask[s] an inartful question [that] opens that door[,] that's [his] problem."

*Trial*

A. Farmers's explanation and evidence as to why Rudnicki's employment was terminated

Daly disputed that Rudnicki ever told him about the substance of what Rudnicki might say in a deposition in *Coates*: Because both Daly and Rudnicki were potential deponents, Daly said he would not have discussed that with Rudnicki. Daly also believed Rudnicki had an obligation to testify truthfully, no matter the "potentially" bad effect, "and then we would have to respond as an organization." Finally, Daly testified he fired Rudnicki not for potential deposition testimony, but because

Rudnicki was unfit to continue in senior management, as multiple examples of his misconduct demonstrated.[7]

First, Farmers asserted that Rudnicki did not escalate the female attorneys' complaints to Bryan Murphy (Murphy), Rudnicki's supervisor prior to Daly, or Daly. This failure fell short of Murphy's and Daly's expectations of how a senior executive and department head should have handled the complaint, and prevented leadership from responding proactively.[8] It also violated Murphy's "no surprises" policy for his direct reports.

Second, Rudnicki asked another employee, Kami Gray (Gray),[9] in a buffet line at a work event, "[h]ow [can] you eat all that and keep a girlish figure?" A witness testified that Gray appeared "shocked" and "offended" with her "eyes wide open." Daly cautioned Rudnicki that "this couldn't happen again."

Third, Rudnicki allegedly told[10] a lesbian employee, Mikyla Moody (Moody), that the departure of an openly lesbian colleague

---

[7] Rudnicki contends that Farmers fabricated these pretextual reasons to retaliate against him.

[8] Daly admitted at trial that no written policy required Rudnicki to escalate this issue to his supervisor, as opposed to HR. Rather, Pugh, the HR partner assigned to Rudnicki's department, was the right person to bring the gender disparity/discrimination issue to.

[9] Her name is also spelled "Grey" in the appellate record.

[10] Rudnicki denied making this comment.

in February 2016 meant that Farmers would need to find "another lesbian to fill the lesbian quota," which Moody found "derogatory and demeaning."

Fourth, in 2015, when Rudnicki met with a female subordinate, Valerie Labarba (Labarba), he sat in a "V position" "within inches" of her in her cubicle, where his legs "straddled" and "touch[ed]" her knee. She felt "uncomfortable" and "leaned back as much as [she] could," while Rudnicki "lean[ed] forward." When Farmers investigated this incident, Rudnicki treated it as a joke, asking the investigator, "was I wearing a kilt?"

Fifth, Rudnicki commented on the physical appearance of a fellow senior executive, Aldredge, in front of her husband at a 2011[11] work event. Aldredge recalled Rudnicki saying, "'I know I was staring at you. Couldn't help. I saw these two attractive people in the room and I just had to say, who are these folks'"; she found these comments "embarrassing" and "trivializing to [her] job." Aldredge also testified that she felt that Rudnicki's remark was a "little over the top" and inappropriate, but she never talked to him about it, complained, or documented it.

Daly learned about this incident after he had initially decided to let Rudnicki go, but considered this "additional interaction" as a factor in his final decision.

Sixth, Rudnicki resisted Daly's dismissal of attorney Timothy O'Shea for destroying documents subject to a litigation hold in *Coates*. But, based on the relevant timeline, Daly admitted that "it could not have physically been a factor" in Daly's decision to terminate Rudnicki's employment.

---

[11] According to Aldredge, this interaction occurred in 2010.

10

B. <u>Work reviews</u>

The parties offered conflicting evidence regarding Rudnicki's work reviews.

1. *Rudnicki's evidence*

During the time Daly supervised him, Rudnicki received no complaints from the 850-plus employees who reported to Rudnicki.

For many years, Rudnicki received positive reviews. In 2012, he was ranked overall "Exceeds expectations." In 2013, Murphy noted that Rudnicki was "driving superior performance across all areas of his responsibility" and promoted him to senior vice president. In 2014, Rudnicki "continue[d] to be a valued member of the Claims team, he brings a style and grace that makes our team better." And in 2015, Daly rated Rudnicki as outstanding regarding customer centricity and successful in all other areas; no ratings were below "successful." There is no indication in any of the written performance reviews that Rudnicki behaved unprofessionally, and Daly never questioned Rudnicki's leadership ability.

2. *Farmers's evidence*

According to Farmers, Murphy warned Rudnicki about improperly "seeking attention" and about being a "class clown" and a "'feudal lord.'"

C. <u>No progressive discipline</u>

Pugh testified Farmers utilized a corrective action policy for all employees, giving them an opportunity to correct their alleged misconduct before other action is taken. Despite the claims at trial of Rudnicki's misconduct, no progressive discipline was ever used with Rudnicki. Elliott never warned him about

11

improving his behavior, offered him a performance improvement plan, or suggested counseling.

D. Rudnicki's character evidence

Although the trial court had cautioned Rudnicki against opening the door into character evidence, he elicited evidence that he was supportive and respectful of women and LGBTQ individuals. Rudnicki's counsel repeatedly coaxed evidence out of Daly that Rudnicki was "very supportive of women in the workplace," "always respectful of female employees" "in [Daly's] presence," and "very supportive of LGBTQ inclusivity," and that Daly had personally never heard Rudnicki "say anything that was inappropriate."

After hearing this testimony, the trial court said it "may" allow rebuttal evidence of Rudnicki's bad acts "because [Rudnicki had] opened that door." Later, the trial court again warned, before Rudnicki testified, that "I am not going to allow Mr. Rudnicki to start talking about" what a "great" and "fair" manager he was. "If you do, you risk having me allowing specific instance[s] of allege[d] bad conduct." Nevertheless, Rudnicki testified that he was a "great ambassador for the Claims Department" and "cheerleader for [his] people," received the "opposite" of criticism for how he addressed "females in the workplace," helped women "lean in," was a "very strong advocate of the LGBTQ," and "had a good sense of humor that most people appreciated." The trial court observed once again that "the door has been opened" and admonished Rudnicki's counsel that "you need to stop pushing the envelope to the point where you are going to get the whole thing busted."

On appeal, Farmers complains that as soon as this evidence was presented to the jury, it should have been allowed to

12

introduce evidence of six instances of Rudnicki's misconduct (evidence excluded prior to trial):

(1) Labarba was not only subjected to Rudnicki's V-position straddle during a one-on-one meeting with him, but she also "recall[ed] maybe a half a dozen times where [Rudnicki] would, during the conversation, put his . . . hand on [her] shoulder while talking," which she found "inappropriate";

(2) Rudnicki put his hand on Elliott's back as they walked offstage after participating in a panel at a conference;

(3) The night before he commented on her "girlish figure," Rudnicki told Gray that she should not drink too much or she might "end up dancing on a table", which would have undercut Rudnicki's characterization of Gray as "thin-skinned" and "overreacting";

(4) Catherine Morris, who shared a cubicle with Labarba in Rudnicki's department, complained about him "touching someone on the shoulder or arm" and "invading her physical space" at work;

(5) Rudnicki referred to one of his female subordinates as "exotic" in a talent review with his peers; and

(6) Rudnicki made another female subordinate, Kamala Wedding, uncomfortable by insisting on carrying her suitcase into her hotel room.

E. Rudnicki's evidence of damages

In addition to evidence in support of his request for economic damages, Rudnicki offered evidence in support of his claim for noneconomic damages. Rudnicki testified that his termination adversely impacted every aspect of his life. He found being unemployed at 64 years old sad and humbling, only experiencing flashes of his old enthusiastic and outgoing

13

personality and unreasonably lashing out at his family in anger. His wife explained that his Farmers job meant absolutely everything to him; he lived, breathed and worked Farmers, the most important thing to him along with his family. Rudnicki went from being the most positive person to withdrawn, angry and unapproachable. And, Rudnicki's relationships with both of his daughters deteriorated.

Experts agreed. Clinical psychologist Craig Snyder administered the Personality Assessment Inventory (PAI) and SIRS-2 (malingering test) and testified that Rudnicki suffered from moderate to severe major depressive disorder and generalized anxiety disorder to a moderate degree. The PAI noted Rudnicki's withdrawal, difficulty engaging, fatigue, feeling demoralized, and futility in engaging, which meant that he was not a candidate for cognitive behavioral therapy.

Defense expert Dr. Matthew Carroll concurred that Rudnicki suffered from symptoms of depression and anxiety after the termination of his employment.

And, Rudnicki's cardiologist, Dr. Sanjiv Goel, testified that on November 29, 2016, Rudnicki went to the emergency room with chest discomfort/angina, not a heart attack. Dr. Goel believed that stress due to his job loss contributed to the chest pain.

*Nonsuit*

The trial court nonsuited Rudnicki's gender discrimination claim and instructed the jury on age discrimination, disability discrimination, retaliation, and wrongful termination.

*Jury verdict*

The jury rejected Rudnicki's age and disability discrimination claims. But the jury sided with Rudnicki on

wrongful termination and retaliation, finding that his role as a "witness or potential witness in the Coates v. Farmers lawsuit" was a "substantial motivating reason" for his termination. It also found that Farmers's "stated reason of . . . Rudnicki's unprofessional behavior and failure to meet [its] expectations for a leader of its branch legal offices" was not "a substantial motivating reason" for its decision to discharge Rudnicki. And, it found that Farmers engaged in "malice, oppression, and/or fraud." He was awarded $5,413,344 in compensatory damages ($3,413,344 in past economic damages; $1 million in future economic damages; and $1 million in noneconomic damages) and $150 million in punitive damages.

*Farmers's motion for judgment notwithstanding the verdict (JNOV) and motion for new trial*

Farmers moved for JNOV, arguing that Rudnicki did not engage in protected activity that could support a retaliation claim under the Fair Employment and Housing Act (FEHA); no reasonable juror could have found causation between Rudnicki's potential deposition in *Coates* and his termination; the attorney-client and attorney-work-product privileges foreclosed Rudnicki's claims; and punitive damages could not be awarded. Farmers alternatively moved for a new trial, arguing that the $150 million punitive damages award was excessive; as such, it was unconstitutional. It also asserted that the $1 million award of noneconomic damages was excessive. Last, it asserted that the trial court wrongfully excluded "rebuttal evidence of Rudnicki's inappropriate treatment of women."

15

*Trial court order denying JNOV, but reducing the punitive damage award from $150 million to $18.5 million*

A. <u>Participation in private FEHA lawsuits is protected activity</u>

The trial court denied the JNOV motion, finding that participation in private FEHA lawsuits is protected activity. In so ruling, the trial court expressly found that Rudnicki assisted in a FEHA lawsuit: "[T]he record contains evidence that Farmers knew that Rudnicki was identified as a witness in *Coates*, he prepared for his deposition in that case with Farmers's counsel Paul Hastings, and his testimony would be adverse to them. Specifically, at trial, Rudnicki testified that in around November 2015, he told Daly that he 'was going to be giving a deposition in the *Coates* matter,' had 'been prepared to give a deposition in the *Coates* matter,' and 'was going to have to be testifying about what [he] believed [were] some failures of Farmers['s] human resources department.' [Citation.] As he made that last statement, he observed Daly become 'kind of red faced and agitated.' [Citation.] And as set forth above, the third claim in *Coates* was a FEHA violation. [Citation.] Those facts are sufficient to establish that Farmers perceived that Rudnicki had, at minimum, 'assisted in any proceeding under this part.' (Gov. Code, § 12940, subd. (h).)"

The trial court further rejected Farmers's contention that retaliation claims can only be brought in administrative proceedings, reasoning: "Farmers's interpretation would give employers carte blanche to retaliate against their employees for testifying adversely to them in in-court FEHA lawsuits—an absurd result that would be contrary to FEHA's purpose and policy." "[T]hus, Rudnicki's participation in *Coates* is a qualifying protected activity."

16

The trial court also rejected Farmers's argument that Rudnicki could not "establish the protected activity element because it decided to terminate his employment after *Coates* had settled, thus obviating him as a witness and any incentive for them to discourage or prevent him from testifying." "FEHA does not allow an employer to make an end-run around its protections because the protected activity ended." "Thus, Rudnicki engaged in a protected activity (or Farmers perceived him as such) even though he did not actually testify in *Coates*."

B. <u>Attorney-client privilege and work product doctrine do not warrant dismissal</u>

The trial court next rejected Farmers's contention that "Rudnicki's claims should be dismissed because he could not have established them without breaching the attorney-client privilege or attorney work product doctrine, and Farmers could not have defended them without doing so." It found that "Rudnicki acted in his capacity as a percipient witness. [He] testified that he 'was not even indirectly involved' in hiring counsel to defend Farmers in *Coates*, 'handling the litigation,' or making 'tactical decisions.' [Citation.] Rather, Farmers's general counsel was. [Citation.] As the Court observed in hearing Farmers's motion in limine about evidence of Rudnicki's conversation with Daly about his anticipated *Coates* testimony [citation], the dynamic of that conversation was that Rudnicki merely communicated that he 'is going to be a subpoenaed witness, and he's telling his superior, as a witness, this is what [he] intend[s] to testify.' [Citation.] So too, when Rudnicki's attorney delivered his closing argument, he merely stated that 'Rudnicki explained to Mr. Daly this is just the real[i]ty of what I saw.' [Citation.] Nothing about . . . that conversation discloses that Rudnicki was providing his legal

17

opinion or otherwise acting as Farmers's counsel in that communication, thus negating the existence of a requisite attorney-client relationship, or divulging any communications he had with outside counsel when preparing for his *Coates* deposition."

"Indeed, Farmers retained an outside law firm (Paul Hastings) to defend it in *Coates*. There is no evidence that Rudnicki was charged with mounting Farmers's defense in that case. And there is no dispute that Rudnicki's duties as a senior vice president at Farmers were focused on managing its in-house branch legal offices overseeing claims litigation, not outside litigation."

"Farmers also asserts that Rudnicki's testimony about the reasons *Coates* settled" was improper. "Even if that testimony were omitted, the evidence that Farmers perceived Rudnicki's anticipated testimony as adverse to them—prior to the *Coates* settlement—would supply the jury with sufficient evidence to find retaliation and need not require Farmers to divulge privileged information or communications in proffering contrary evidence about its decision-makers' state of mind. Indeed, Rudnicki's testimony focused on his conversation with Daly and Daly's verbal and non-verbal responses that supported a reasonable inference that Farmers perceived Rudnicki's anticipated testimony as adverse to it, which testimony would supply the jury with sufficient evidence to find retaliation. Rudnicki did not make arguments or testify about why *Coates* settled. Rudnicki's testimony regarding Daly's statement ('You are responsible for the [*Coates*] litigation settlement') was offered to show Daly's state of mind, not for the truth of the matter asserted. Thus, Farmers's claim that it could not defend its case

18

without revealing privileged communications is unsupported by the testimony at trial or established cases."

"In sum, under these facts, Rudnicki's communications with Daly were not privileged attorney-client communications, and Farmers was not deprived of its defense in allegedly being precluded from introducing evidence that Rudnicki's anticipated adverse testimony was not the reason *Coates* settled."

C. <u>Noneconomic damage award is not excessive</u>

The trial court went on to find the noneconomic damage award appropriate. "Rudnicki's diagnosis was moderate to severe, and he experienced numerous symptoms resulting from his retaliatory employment termination." He was diagnosed with depression and anxiety, stemming from the termination of his employment. Rudnicki's cardiologist testified that "he thought the stress from Rudnicki's losing his job caused Rudnicki's chest pain." And, Rudnicki's wife testified that his "relationship with her and their children declined, he was withdrawn, he lost his social life that was previously connected with other Farmers employees including golf outings, and he did not regularly shower or change clothes."

Finally, the trial court specifically noted that "the $1 million [the jury] awarded [Rudnicki] in noneconomic damages is relatively small in comparison to [the amount of economic damages] and does not appear to be punitive."

D. <u>Reduction of punitive damage award</u>

The trial court found that "the record contains sufficient evidence to support punitive liability against" Farmers. But, it granted a new trial as to the amount of punitive damages, conditioned on Rudnicki's acceptance of a remittitur to an award

of $18,945,000 (representing a punitive-to-compensatory damages ratio of 3.5-to-one).

*Judgment*

Rudnicki accepted the remittitur. The trial court then entered an amended judgment awarding Rudnicki $24,358,344 in total damages, as well as costs and attorney fees.

*Appeal and cross-appeal*

Farmers's timely appeal from the judgment ensued. Rudnicki timely filed a protective cross-appeal.

## DISCUSSION

I. *Rudnicki's retaliation claim*

A. <u>Relevant law</u>

Government Code section 12940, subdivision (h), makes it unlawful "[f]or any employer . . . to discharge . . . any person because the person has opposed any practices forbidden under this part or because the person has . . . testified, or assisted in any proceeding under this part." To make out a prima facie case of retaliation under the statute, the plaintiff-employee must show that (1) he engaged in a protected activity, (2) the defendant-employer subjected him to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

"[S]ection 12940, subdivision (h) encompasses a broad range of protected activity." (*Rope v. Auto-Chlor System of Washington, Inc.* (2013) 220 Cal.App.4th 635, 652, superseded by statute on other grounds as stated in *Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1039 & fn. 3.) "[P]rotected activity takes the form of opposing any practices forbidden by FEHA or participating in any

20

proceeding conducted by the [Department of Fair Employment and Housing] or the Fair Employment and Housing Council (FEHC). [Citations.]" (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 380; see also *Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 382 [protected activity includes "opposition to practices one could reasonably believe are unlawful under the FEHA"].)

Relevant here, "[o]pposing practices forbidden by FEHA includes . . . participating in an activity perceived by the employer as opposition to discrimination." (*Nealy v. City of Santa Monica, supra*, 234 Cal.App.4th at p. 380, citing, Cal. Code Regs., tit. 2, § 11021, subd. (a)(1).) Accordingly, it includes "evidence an employer believed the plaintiff was a potential witness in another employee's FEHA action." (*Rope v. Auto-Chlor System of Washington, Inc., supra*, 220 Cal.App.4th at p. 652.)

"Actions for retaliation are 'inherently fact-driven'; it is the jury, not the court, that is charged with determining the facts. [Citation.]" (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 299.)

B. <u>Analysis</u>

Rudnicki proved all elements of retaliation. (1) He engaged in a protected activity, namely he prepared for a deposition that would have gone against Farmers's interests. (2) He was subjected to an adverse employment action—his employment was terminated. And, (3) Rudnicki proved a causal link between the two—Rudnicki told Daly about his intended deposition testimony, and a reasonable jury could infer that Rudnicki's employment was terminated because Farmers did not want him to offer adverse testimony in *Coates*.

21

C. <u>Farmers's challenges to the judgment</u>

Urging us to reverse the judgment, Farmers argues that Rudnicki failed to prove either a protected activity or causation under FEHA.

### 1. *Rudnicki was engaged in protected activity*

Farmers asserts that Rudnicki was not engaged in a protected activity because FEHA protects participation in administrative proceedings only, not civil actions. To the extent this issue calls for statutory interpretation, we conduct a de novo review. (*Lopez v. Ledesma* (2022) 12 Cal.5th 848, 857.)

#### a. <u>Relevant law</u>

Government Code section 12940, subdivision (h), provides, in relevant part, that an employer may not discharge an employee "because the person has filed a complaint, testified, or assisted in any proceeding under this part." The statute is encompassed within FEHA; and Government Code section 12965, subdivision (b), "creates a private right of action to enforce FEHA." (*Patterson v. Superior Court* (2021) 70 Cal.App.5th 473, 486.)

Code of Civil Procedure section 22 defines an "'action'" as "an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense." Similarly, Evidence Code section 901 defines "proceeding" as "any action . . . in which, pursuant to law, testimony can be compelled to be given."

#### b. <u>Analysis</u>

Applying these legal principles, we conclude that protected activity for purposes of a FEHA retaliation claim includes participation or assistance with a civil action. As the trial court

22

aptly noted, Farmers's contrary contention makes no sense. "Farmers's logic ignores that 'this part' . . . encompasses Government Code section 12965, which statute 'creates a private right of action to enforce FEHA' [citation], thus effectively bringing private FEHA actions into the type of proceedings in which an employee may have participated in asserting a protected activity. Moreover, it ignores the case law, public policy referenced therein, and related regulation that require FEHA's liberal construction." The trial court continued: "Farmers's interpretation would give employers carte blanche to retaliate against their employees for testifying adversely to them in in-court FEHA lawsuits—an absurd result that would be contrary to FEHA's purpose and policy."

Simply put, Farmers's interpretation of "retaliation" is far too narrow and unsupported by legal authority.

In making this argument, Farmers misleadingly directs us to only part[12] of section 11021 of title 2 of the California Code of Regulations, which provides that an employer may not retaliate against an employee for assisting or participating "in any manner in an investigation, proceeding, or hearing conducted by the Council or Department or its staff." (Cal. Code Regs., tit. 2,

---

[12] In its reply brief, Farmers asserts that Rudnicki "appears" to be making an argument under Government Code section 12940, subdivision (h), which provides, in relevant part, that it shall be unlawful for an employer to "discriminate against any person because the person has opposed any practices forbidden" by FEHA (the opposition clause). According to Farmers, Rudnicki did not preserve this argument on appeal. Our analysis should not be construed as a finding that Rudnicki proved his claim under the opposition clause.

23

§ 11021(a).) But the entire regulation provides, in relevant part: "It is unlawful for an employer to [retaliate against an employee] because that individual has opposed practices prohibited by [FEHA] *or* has . . . assisted or participated in any manner in an investigation, proceeding, or hearing conducted by the [State Civil Rights] Council or [Civil Rights] Department or its staff." (Cal. Code Regs., tit. 2, § 11021(a), italics and bold added.) Even if Farmers were correct and a retaliation claim could only be raised in connection with an administrative proceeding, that theory accounts for just part of the regulation. It ignores the first part of the regulation, which specifically notes that an employer cannot retaliate against an employee for opposing practices prohibited by FEHA. And opposing practices prohibited by FEHA includes "[p]articipating in an activity that is perceived by the employer . . . as opposition to discrimination." (Cal. Code Regs., tit. 2, § 11021(a)(1)(C) & (D).) Offering deposition testimony contrary to Farmers's interests falls squarely within the scope of this language.

Farmers further contends that "No Appellate Decision Has Extended FEHA's Participation Clause to Civil Litigation." (Bolding omitted.) Again, Farmers's argument is misleading. While none of the cases cited by Farmers applies FEHA's participation clause to civil litigation, that is because that was not the issue before them. For example, *McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510 held: "Government Code section 12940, subdivision (h), does not shield an employee against termination or lesser discipline for either lying or withholding information during an employer's internal investigation of a discrimination claim." (*McGrory*, *supra*, at

24

p. 1528.)  It did not limit FEHA retaliation claims to administrative proceedings.

### 2.  *Rudnicki participated in* <u>Coates</u>

Alternatively, Farmers argues that because Rudnicki never participated in *Coates*, the verdict must be reversed.  Applying the same de novo standard of review set forth above, we are not convinced.

"Employer retaliation against employees who are believed to be prospective complainants or witnesses for complainants undermines this legislative purpose just as effectively as retaliation after the filing of a complaint.  To limit FEHA in such a way would be to condone 'an absurd result' [citation] that is contrary to legislative intent. . . .  FEHA protects employees against preemptive retaliation by the employer."  (*Steele v. Youthful Offender Parole Bd.* (2008) 162 Cal.App.4th 1241, 1255; see also *Jute v. Hamilton Sundstrand Corp.* (2d Cir. 2005) 420 F.3d 166, 169–170.)

The fact that Rudnicki may not have been "on the verge of" offering deposition testimony does not alter our analysis. Rudnicki was prepared for deposition by defense counsel regardless of how soon that deposition was scheduled and regardless of whether that deposition actually occurred. "Accepting [Farmers's] argument would mean, for example, that an employer could freely retaliate against a Title VII whistleblower, as long as it did so before the employee actually testified."  (*Jute v. Hamilton Sundstrand Corp., supra*, 420 F.3d at p. 175.)

25

*3. A reasonable jury could have found (and did find) that Rudnicki's potential deposition testimony caused his termination*

Finally, Farmers contends that no reasonable jury could have found that Rudnicki's hypothetical deposition testimony caused his termination.

"'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.]' [Citation.]" (*Reynaud v. Technicolor Creative Services USA, Inc.* (2020) 46 Cal.App.5th 1007, 1015.)

"'"In applying this standard of review, we 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" [Citation.] "'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value." [Citation.] We do not reweigh evidence or reassess the credibility of witnesses. [Citation.] We are "not a second trier of fact." [Citation.]' [Citation.]" (*Reynaud v. Technicolor Creative Services USA, Inc.*, *supra*, 46 Cal.App.5th at p. 1015.)

"'Our role is to determine the legal sufficiency of the found facts and not to second guess the reasoning or wisdom of the fact finder.' [Citation.] "'Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.

And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable." [Citation.]' [Citation.]" (*Reynaud v. Technicolor Creative Services USA, Inc., supra*, 46 Cal.App.5th at p. 1017.)

Ample evidence supports the jury verdict. Rudnicki testified that he told Daly that he was going to offer evidence contrary to Farmers's interests if and when he was deposed in *Coates*. Shortly thereafter, Daly began treating Rudnicki coolly. Then, within months, Rudnicki was terminated. The jury could reasonably infer that Rudnicki was wrongfully terminated because of his anticipated deposition testimony. The fact that there may have been evidence to support Farmers's narrative as well does not compel reversal. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245 ["We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party"].)

II. *Alleged evidentiary errors*

A. <u>Privileged evidence</u>

Farmers contends that Rudnicki wrongfully established his retaliation and wrongful termination claims through privileged evidence, specifically privileged communications about *Coates* with Daly.

1. *Standard of review*

"'The question whether the attorney-client privilege applies to a particular communication is a question of fact if the evidence is in conflict.' [Citation.] "When the facts, or reasonable inferences from the facts, shown in support of or in opposition to

27

the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it . . . .'" [Citation.]" (*DP Pham LLC v. Cheadle* (2016) 246 Cal.App.4th 653, 664.)

2. *Relevant law*

"[T]here is no reason inherent in the nature of an attorney's role as in-house counsel to a corporation that in itself precludes the maintenance of a retaliatory discharge claim, *provided* it can be established without breaching the attorney-client privilege or unduly endangering the values lying at the heart of the professional relationship." (*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164, 1169 (*General Dynamics*).) "Except in those rare instances when disclosure is explicitly permitted or mandated by an ethics code provision or statute, it is never the business of the lawyer to disclose publicly the secrets of the client." (*Id.* at p. 1190; see also *O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1130, fn. 5 ["in-house counsel could sue a former employer for wrongful termination as long as confidential information was not publicly disclosed"].)

"The dual status of in-house counsel—acting as both employee and attorney—and the dual status of the company—acting as both employer and client—can pose some challenging questions about when one role takes precedence over another." (*Missakian v. Amusement Industry, Inc.* (2021) 69 Cal.App.5th 630, 651.)

"'The attorney-client privilege "authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client." [Citations.]'

28

[Citation.]" (*People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 645.) "'[C]onfidential communication between client and lawyer'" is defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (Evid. Code, § 952.)

"[T]he attorney-client privilege attaches only where the communication is made in confidence pursuant to a client-attorney relationship with *respect to the particular matter*. [Citations.] Furthermore, '[t]o make the communication privileged the dominant purpose must be for transmittal to an attorney "in the course of professional employment"' [citations]. The privilege does not apply to communications to an attorney who is transacting business that might have been transacted by another agent who is not an attorney [citation]." (*Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 32.) Thus, "[t]he privilege protects only the disclosure of communications between attorney and client. It does not protect disclosure of the underlying facts which were communicated." (*Triple A Machine Shop, Inc. v. State of California* (1989) 213 Cal.App.3d 131, 143.)

"Whether a particular communication is predominantly in furtherance of the attorney-client relationship is a question of

fact." (*Montebello Rose Co. v. Agricultural Labor Relations Bd.*, *supra*, 119 Cal.App.3d at p. 33.)

"[T]rial courts can and should apply an array of ad hoc measures from their equitable arsenal designed to permit the attorney plaintiff to attempt to make the necessary proof while protecting from disclosure client confidences subject to the privilege." (*General Dynamics*, *supra*, 7 Cal.4th at p. 1191.)

### 3. *Analysis*

Here, Rudnicki was able to prove his claim without breaching the attorney-client privilege. As the trial court aptly noted, "Rudnicki's testimony focused on his conversation with Daly and Daly's verbal and non-verbal responses that supported a reasonable inference that Farmers perceived Rudnicki's anticipated testimony as adverse to it, which testimony would supply the jury with sufficient evidence to find retaliation." We agree. Rudnicki's claim is based upon what he told Daly about his intended deposition testimony in the *Coates* litigation. His statement, and resulting conversation with Daly, was not a confidential communication between client and attorney. It did not involve legal strategy. The communication could have been made by any employee who had information concerning Farmers's HR failures;[13] it was not made in the course of Rudnicki's representation of Farmers.

In fact, Rudnicki was not "acting *as an attorney* in being the person responsible for handling" the *Coates* litigation.

---

[13] As Farmers agrees in its reply brief, "many other employees could have testified that HR did not share gender-related data." In fact, that is what defense counsel argued to the jury.

(*Gutierrez v. G & M Oil Co., Inc.* (2010) 184 Cal.App.4th 551, 561.) Paul Hastings was acting as Farmers's counsel in *Coates*. Rudnicki "was not even indirectly involved" in hiring Paul Hastings to defend *Coates*; he was not "handling the litigation" or making "tactical decisions."[14] Rather, Farmers's general counsel was, and Rudnicki did not report to the general counsel. Rudnicki's role as in-house counsel was limited to leading the BLO's in their representation of Farmers's insureds. He did not publicly disclose Farmers's secrets. (*General Dynamics*, *supra*, 7 Cal.4th at p. 1190.)

And, the trial court took steps to ensure that confidential information was not disclosed during trial. Rudnicki did not testify about his conversations with Paul Hastings in preparation for his deposition. Rudnicki did not testify as to the substance of the settlement reached in *Coates*. While he did testify that Daly told him that he was responsible for the *Coates* settlement, that evidence was offered to show Daly's state of mind—he blamed Rudnicki for the *Coates* litigation and resulting settlement because he either did not escalate the women's concerns and/or did not resolve the gender concerns.

Citing *Carroll v. Commission on Teacher Credentialing* (2020) 56 Cal.App.5th 365, Farmers asserts that "[t]he only way to rebut the charge that Daly had a retaliatory state of mind was to prove that *Coates* actually settled for reasons unrelated to Rudnicki's potential deposition testimony. Those reasons are

_____

[14]    Farmers argued to the jury: "Rudnicki was not a decision-maker in that [*Coates*] litigation. As a witness he was kept at arms-length and had no role in decisions regarding Farmers's defense."

invariably privileged. Thus, Rudnicki's testimony on this privileged subject put Defendants 'in an untenable position' in which they could defend themselves fully only by 'effectively waiving the attorney-client privilege.' [Citation.]" We disagree.

Farmers never had to disclose its confidential reasons for settling *Coates*. There was never a suggestion that *Coates* settled because of Rudnicki's anticipated deposition testimony. In fact, as argued by Farmers on appeal, Daly's statement does not refer to Rudnicki's deposition testimony—it "refers to Rudnicki's years-long mismanagement of a department experiencing gender-equity concerns that he failed to properly escalate to Murphy or Daly—a perfectly legitimate reason to let him go." Under these circumstances, Farmers was not denied an opportunity to fully defend itself without waiving the attorney-client privilege and/or work product doctrine.

B. <u>Trial court's exclusion of rebuttal evidence of other instances of Rudnicki's alleged misconduct</u>

Farmers contends that the trial court erred in prejudicially excluding rebuttal evidence that Rudnicki mistreated women at work.

1. *Standard of review and relevant law*

"Pursuant to Evidence Code section 352, the trial court has discretion to exclude evidence 'if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.]" (*Thompson v. County of Los Angeles* (2006) 142 Cal.App.4th 154, 171.) "'[T]he trial court has broad discretion to exclude otherwise relevant evidence

under Evidence Code section 352.' [Citation.]" (*Thompson*, *supra*, at p. 171.)

2. *Analysis*

Applying these legal principles, we conclude that the trial court did not abuse its discretion. Simply put, the trial court acted well within its discretion when it determined prior to trial that the excluded evidence was more prejudicial than probative and would have necessitated an undue consumption of time.

Farmers contends that even if the trial court did not err in granting Rudnicki's motion in limine, it should have revisited this evidence after Rudnicki elicited character evidence. There are multiple problems with this argument. First, Farmers failed to raise this argument with the trial court. As soon as the alleged "floodgates" of character evidence came into evidence, Farmers should have asked the trial court to revisit its ruling on the motion in limine. (*People v. Karis* (1988) 46 Cal.3d 612, 634, fn. 16 [a trial court may reconsider its ruling on a motion in limine during the course of a trial].) In the context of the trial here, there is no reason to think that such a request would have been futile.

Second, although Farmers directs us to the six alleged instances of prior bad acts, after Rudnicki allegedly "opened the floodgates" of character evidence, it only sought to introduce evidence of one of those six instances. Again, if Farmers wanted the trial court to reconsider its prior order concerning these six instances of alleged misconduct, it should have raised all six with the trial court at the appropriate time.

33

Third, Farmers ignores the fact that the trial court gave a limiting instruction[15] concerning much of the alleged character evidence.  It told the jury:  "You have heard evidence about Andrew Rudnicki's work history, some of which relates to the support of women and members of the LGBTQ community in the workplace at Farmers during his employment.  You must not consider such evidence to determine whether Andrew Rudnicki made certain comments or behaved in certain ways on specific occasions."  We presume the jury followed this instruction. (*Garcia v. Myllyla* (2019) 40 Cal.App.5th 990, 1005.)

*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938 does not compel a different result.  In *Andrews*, the Court of Appeal reversed a trial court's evidentiary ruling that kept "out *all* of the misconduct incidents." (*Id*. at p. 947, italics added.)  Here, the trial court did not exclude all prior instances of alleged mistreatment of women; rather, it managed this otherwise lengthy trial with numerous witnesses and limited Farmers to some instances of misconduct and excluded evidence of those of which Farmers (through Daly) was unaware when the decision to terminate Rudnicki's employment was made.  (See *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377 [courts have the inherent power to control litigation before them]; *Hernandez v. Superior Court* (2004) 115 Cal.App.4th 1242, 1246–1247 [discussing trial court's discretion to manage its calendar].)

---

[15]    Both parties agreed to this language.

III. *Compensatory damage award*

"A . . . retaliatory termination is undoubtedly upsetting and warrants reasonable compensation for any accompanying emotional distress." (*Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 142 (*Briley*).) The issue on appeal is whether the $1 million award of noneconomic damages was unreasonable. Farmers contends that the award is excessive and not supported by the evidence.

A. <u>Relevant law</u>

Code of Civil Procedure section 657 sets forth the grounds for a new trial, stating in pertinent part: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, materially affecting the substantial rights of such party: [¶] . . . [¶] 5. Excessive or inadequate damages. [¶] . . . [¶] A new trial shall not be granted upon the ground of . . . excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

The amount of damages is a question of fact first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. (Code Civ. Proc., § 43; *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.) "'They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation].' [Citation.]" (*Horsford v. Board of Trustees of*

*California State University* (2005) 132 Cal.App.4th 359, 389 (*Horsford*).)

A "contention that the evidence does not support the verdict is reviewed under the substantial evidence standard. In reviewing a claim of insufficiency of evidence, the appellate court must consider the whole record, view the evidence in the light most favorable to the judgment, presume every fact the trier of fact could reasonably deduce from the evidence, and defer to the trier of fact's determination of the weight and credibility of the evidence." (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614.)

After reviewing the record in light of this standard, an appellate court may reduce an award found to be excessive and unsupported by the record. (*Behr v. Redmond, supra,* 193 Cal.App.4th at p. 535.)

"'[T]here is no fixed or absolute standard by which to compute the monetary value of emotional distress.'" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067, fn. 17.) "It is only in a case where the amount of the award of general damages is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive or grossly inadequate general damages." (*Daggett v. Atchison, Topeka and Santa Fe Railway Company* (1957) 48 Cal.2d 655, 666.) "'The question is not what this court would have awarded as the trier of fact, but whether this court can say that the award is so high as to suggest passion or prejudice.'" (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 507.)

"'In making this assessment, the court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations.'

[Citation.] The relevant considerations include inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct. [Citations.]" (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299.)

B. <u>Analysis</u>

Applying the foregoing legal authorities, we conclude that there was ample evidence[16] to support the $1 million award of noneconomic damages. Rudnicki testified that he found being unemployed at 64 years old sad and humbling, only experiencing flashes of his old enthusiastic and outgoing personality and unreasonably lashing out at his family in anger. His wife explained that his Farmers job meant absolutely everything to him; he lived, breathed and worked Farmers, the most important thing to him along with his family. Rudnicki went from being the most positive person to withdrawn, angry and unapproachable. And, his relationships with both of his daughters deteriorated and became strained.

Rudnicki's cardiologist, Dr. Goel, testified that on November 29, 2016, Rudnicki went to the hospital with chest discomfort/angina, not a heart attack. Dr. Goel believed that stress resulting from the loss of his job contributed to the chest pain. While Dr. Goel stated that what he remembered "at th[e] time" of his deposition was that Rudnicki had said that he was

_____

[16] In reaching this conclusion, we note that Farmers ignores much of the evidence presented at trial and only relies upon evidence that supports its contention on appeal. As set forth above, that is not grounds to reverse. (*Pope v. Babick, supra,* 229 Cal.App.4th at p. 1245.)

37

stressed about this litigation, that testimony did not vitiate his undisputed opinion that job loss stress caused Rudnicki's angina.

Notably, Farmers directs us to nothing in the appellate record that shows that the jury was influenced by improper considerations. There is no inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct.

As the trial court correctly recognized: "[T]he evidence shows that Farmers's termination of Rudnicki directly caused his moderate to severe depression diagnosis, numerous symptoms of emotional distress, and angina. Further, there was no dispute that Rudnicki was not malingering in describing his symptoms. Moreover, the evidence supports a reasonable inference that Farmers's termination of Rudnicki abruptly severed his decades of social relationships and removed his sense of identity and purpose." For this reason, "the evidence more than supports the $1 million non-economic damages award."

*Briley*, *supra*, 66 Cal.App.5th 119 does not compel a different result. In that case, the plaintiff-employee prevailed on his claim for retaliation (Lab. Code, § 1102.5). (*Briley*, *supra*, at p. 123.) He was awarded "$2 million for past noneconomic damages covering a period of about three years, amounting to more than $1,700 per day," even though he failed to present "evidence of significant, concrete harm." (*Briley*, *supra*, at p. 142.) Under these circumstances, the award "was so excessive as to suggest it resulted from passion or prejudice." (*Id.* at p. 124.) Accordingly, the Court of Appeal vacated the award of noneconomic damages. (*Ibid.*)

In contrast, Rudnicki was employed by Farmers for 37 years. And, as set forth above, he offered evidence of severe symptoms stemming from his retaliatory termination.

*Mokler v. City of Orange* (2007) 157 Cal.App.4th 121 is also distinguishable for the simple reason that in *Mokler*, the plaintiff did not offer sufficient evidence to support the jury's award of over $1.6 million in noneconomic damages. (*Id.* at p. 147.) After all, the plaintiff did not require medical or professional attention for her humiliation of being terminated. And, she was unemployed for only two weeks following her termination, suggesting that (1) her reputation remained unimpaired, and (2) she did not suffer emotional distress associated with being unable to find comparable employment. (*Ibid.*; see also *Horsford*, *supra*, 132 Cal.App.4th at pp. 389–390 [upholding a trial court's reduction of an award of noneconomic damages].) In contrast, as set forth above, Rudnicki offered such evidence, including his own testimony, testimony from his wife, and testimony from several medical experts.

IV. *Punitive damage award*

    A. <u>Entitlement to punitive damages</u>

Farmers argues that Rudnicki is not entitled to any punitive damages because he failed to prove oppression, fraud, or malice by clear and convincing evidence.

    1. *Standard of review and relevant law*

A plaintiff may recover punitive damages if he proved at trial by clear and convincing evidence that the defendant was guilty of oppression, fraud, or malice. (Civ. Code, § 3294, subd. (a).) For purposes of awarding punitive damages, "malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the

39

defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code, § 3294, subd. (c)(1).) Oppression is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code, § 3294, subd. (c)(2).)

"'"Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that his conduct may be called [willful] or wanton." [Citation.]' [Citation.]" (*Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 716.)

We review an award of punitive damages for substantial evidence. (*Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 679.) "Because our review is for substantial evidence, we are bound to consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment. However, since the jury's findings were subject to a heightened burden of proof, we review the record in support of these findings in light of that burden. Thus, we inquire whether the record contains "'substantial evidence to support a determination by clear and convincing evidence . . . .'"' [Citation.]" (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 451.)

2. *Analysis*

Applying these legal principles, we conclude that substantial evidence supports the award of punitive damages. At the risk of sounding redundant, Rudnicki convincingly proved that he was fired in retaliation for testimony he was going to give

40

against Farmers in *Coates*.  And, the appellate record shows that Farmers attempted to hide its "improper basis" for firing Rudnicki with a "false explanation," namely that he mistreated female employees and failed to comport with Farmers's standards for executives.  (*Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912.)

Farmers further argues that there was no evidence that FGI ratified FIE Daly's retaliatory termination of Rudnicki. Farmers seems to forget, as pointed out in Rudnicki's respondent's brief, that the jury found both FIE and FGI to be Rudnicki's employers based upon an integrated enterprise. Under these circumstances, we agree with the trial court that no additional evidence of ratification by FGI was required.  Farmers does not offer legal authority or argue otherwise.

B. Amount of punitive damages

Alternatively, Farmers challenges the amount of punitive damages awarded.

1. *Relevant law*

"Our Supreme Court has summarized the fundamental principles of punitive damages under California law.  The purposes of punitive damages are to punish the defendant and deter the commission of similar acts.  [Citations.]  Three primary considerations govern the amount of punitive damages:  (1) the reprehensibility of the defendant's conduct; (2) the injury suffered by the victims; and (3) the wealth of the defendant."  (*Rufo v. Simpson, supra*, 86 Cal.App.4th at pp. 619–620.)

"Because the quintessence of punitive damages is to deter future misconduct by the defendant, the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.'  [Citations.]  The question cannot be answered in the abstract.  The reviewing

41

court must consider the amount of the award in light of the relevant facts.  The nature of the inquiry is a comparative one.  Deciding in the abstract whether an award is 'excessive' is like deciding whether it is 'bigger,' without asking 'Bigger than what?'" (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110.)

### 2. *Due process*

Farmers argues that the punitive damage award violates due process.  "In deciding whether an award of punitive damages is constitutionally excessive . . . , we . . . review the award de novo." (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172.)

It is well-settled that "[t]he due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages." (*Roby*, *supra*, 47 Cal.4th at p. 712.)  "In particular, due process prohibits the imposition of grossly excessive or arbitrary punitive damages awards, "'for due process entitles a tortfeasor to "'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.'"" [Citation.]'  [Citation.]" (*Contreras-Velazquez v. Family Health Centers of San Diego, Inc.* (2021) 62 Cal.App.5th 88, 104 (*Contreras-Velazquez*).)

"The United States Supreme Court has articulated 'a set of substantive guideposts that reviewing courts must consider in evaluating the size of punitive damages awards:  "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.'"

[Citation.]" (*Contreras-Velazquez, supra*, 62 Cal.App.5th at p. 104.)

### a. Reprehensibility

"Of the three guideposts articulated by the United States Supreme Court, 'the most important is the degree of reprehensibility of the defendant's conduct.' [Citations.] In assessing reprehensibility, we must consider the following five factors: 'whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident."' [Citation.]" (*Contreras-Velazquez, supra*, 62 Cal.App.5th at p. 105.)

"The first reprehensibility factor is present here because, as the trial court found, [Farmers's] conduct caused [Rudnicki] physical harm in the form of emotional and mental distress. [Citations.]" (*Contreras-Velazquez, supra*, 62 Cal.App.5th at p. 105.) Testimony from witnesses, including Rudnicki, Rudnicki's wife, and various doctors, established that "Rudnicki's retaliatory termination caused him a moderate to severe depression and anxiety diagnosis with numerous symptoms of emotional distress, abrupt disruption of his lifelong social relationships, and angina." In fact, Rudnicki sought noneconomic damages for mental suffering and the jury awarded him $1 million. "Under these circumstances, the first reprehensibility factor weighs in favor of an aggravated punitive damages award." (*Ibid*.)

43

"The second reprehensibility factor is present as well." (*Contreras-Velazquez, supra*, 62 Cal.App.5th at p. 105.) Farmers could have foreseen that its retaliatory conduct would affect Rudnicki's emotional well-being, thereby evincing an indifference to or reckless disregard of the health or safety of others. (*Id.* at p. 106 [second reprehensibility factor may be present where, as here, the defendant disregarded the health and safety of the plaintiff alone].) Farmers likely "knew that Rudnicki had a heart condition because he took a leave of absence from his employment there in March 2015. [Citation.] It also likely knew it would be foreclosing Rudnicki's social relationships and deep-seated sense of his identity because of his longevity at Farmers and from likely observing him interacting with company employees at work and company social events. Further, Farmers intentionally punished Rudnicki for potentially testifying adversely to its interests and in favor of a class of approximately 300 women who alleged sex discrimination in their employment at Farmers. Moreover, Dailey admitted that he never reviewed Rudnicki's personnel file before concurring in Daly's decision to terminate Rudnicki's employment, thus further demonstrating Farmers's indifference."

The third factor is minimally present. On the one hand, Rudnicki had a substantial vested pension and his income was likely substantial for many years. But, as the trial court noted, "his future employment prospects are dim." He was the sole income earner in the family when his employment was terminated at age 64, and he had no plans to stop working until his children were out of college.

The fourth factor does not appear to be present here. "[T]here was 'scant evidence [that Farmers engaged in] repeated

44

misconduct of the sort that injured' [Rudnicki]. [Citation.]" (*Contreras-Velazquez*, *supra*, 62 Cal.App.5th at p. 107.)

Finally, "[t]he fifth reprehensibility factor 'is of little value in assessing a California punitive damages award because "accidentally harmful conduct cannot provide the basis for punitive damages under our law."' [Citation.]" (*Contreras-Velazquez*, *supra*, 62 Cal.App.5th at p. 107.)

b. Disparity between compensatory damages and punitive damages

"'[T]he disparity between the actual . . . harm suffered by [Rudnicki] and the punitive damages award'" (*Contreras-Velazquez*, *supra*, 62 Cal.App.5th at p. 108) does not demonstrate a violation of due process. The ratio between the compensatory damage award of $5,413,344 and the reduced punitive damage award of $18.9 million is 3.5-to-one. This punitive damage award bears a reasonable and proportionate relationship to the compensatory damage award. (*Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 563 (*Bullock*).)

c. Comparable civil penalties

Finally, we consider the difference between the punitive damages and any civil penalties authorized or imposed in comparable cases. (*Roby*, *supra*, 47 Cal.4th at p. 718.) As there are no comparable civil penalties, this guidepost "plays no significant role in our analysis." (*Bullock*, *supra*, 198 Cal.App.4th at p. 570.) Farmers's argument notwithstanding, the fact that there is no comparable penalty does not compel the conclusion that the 3.5-to-one ratio is unconstitutional.

d. Conclusion

Farmers engaged in misconduct that can be characterized as moderately reprehensible. It caused physical harm in a

45

foreseeable manner. While the jury awarded Rudnicki approximately $5.4 million in compensatory damages, that amount does not appear to contain a punitive element. After all, the jury voted to award Rudnicki $150 million in punitive damages; from this award, we can reasonably infer that the jury intended to punish Farmers with the sizeable punitive damage award, not the compensatory damage award. Given all these factors, we conclude that the trial court did not err in setting the ratio for a punitive damages award to compensatory damage award to 3.5-to-one. (See, e.g., *Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 219–223 [six-to-one punitive to compensatory damages ratio was appropriate even though the employer's conduct was only moderately reprehensible]; *Contreras-Velazquez, supra*, 62 Cal.App.5th at p. 111 [employer's "somewhat or moderately reprehensible" misconduct justified a ratio for a punitive damages award of two-to-one].)

   3. *Ratio cap*

At a minimum, Farmers contends that the compensatory damage award caps the ratio of punitive damages to compensatory damages at no more than one-to-one.

There is no "'bright-line ratio which a punitive damages award cannot exceed,' and 'there are no rigid benchmarks that a punitive damages award may not surpass.' [Citation.]" (*Bullock, supra*, 198 Cal.App.4th at p. 563.) That said, "'in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with" double- or triple-digit ratios. (*Bullock, supra*, at p. 563; see also *Zirpel v. Alki*

46

*David Productions, Inc.* (2023) 93 Cal.App.5th 563, 580.)  Our Supreme Court "has concluded that an appropriate maximum ratio between punitive and compensatory damages beyond which punitive damages in a given case would be excessive, and therefore unconstitutionally arbitrary, is '10 times the compensatory award.' [Citation.]" (*Zirpel v. Alki David Productions, Inc.*, *supra*, at p. 580.)

"Certainly, a one-to-one ratio of punitive to compensatory damages can in some cases—or perhaps in many cases where the compensatory damages award is substantial—be the constitutional maximum.  [Citations.]  However, 'there is no fixed formula that requires a court to set punitive damages equal to compensatory damages' whenever compensatory damages are substantial.  [Citations.]" (*Contreras-Velazquez*, *supra*, 62 Cal.App.5th at p. 109.)

"The single-digit [3.5-to-one] ratio between punitive and compensatory damages in this case falls below the maximum 10-to-one ratio prescribed by the Supreme Court." (*Zirpel v. Alki David Productions, Inc.*, *supra*, 93 Cal.App.5th at p. 580.)  And, for the reasons set forth above, the facts and circumstances of this case support an award of punitive damages, as found by the jury and as appropriately reduced by the trial court.

**DISPOSITION**

The judgment is affirmed. Rudnicki's cross-appeal is dismissed. Rudnicki is entitled to attorney fees and costs (Gov. Code, § 12965, subd. (c)(6)) on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ

48